BLACK, Circuit Judge: On October 17, 2012, police officers'Joey Horsley, Nathalie Whitener, and Joseph Mayfield, defendants-appellees in this ease, executed a search warrant at a private residence in Hiram, Georgia, intending to seize methamphetamines suspected to be in the possession of Brenda Van Cleve. During the execution of the warrant, a confrontation ensued. Each of the officers fired one shot, two of which struck Daniel Hammett, Van Cleve’s husband. Hammett died from his injuries, and plaintiff-appellant Justin Hammett (Plaintiff) brought this suit on behalf of Hammett’s estate. The complaint alleges the officers used excessive force against Hammett in violation of the Fourth' Amendment. The district court granted summary judgment, determining the officers were entitled to qualified immunity. Plaintiff appealed, and we affirm. I. BACKGROUND A.The Hammett Household At the time of his death, Daniel' Hammett was married to Brenda Van Cleve. The two lived together in a house on Nebo Road with their son Clyde Dillon Hammett (Clyde), who was seventeen years old and in high school at the time of the incident. Together, Hammett and Van Cleve lived on Hammett’s disability benefits of $650-$700 per month, plus Hammett’s earnings from occasional repossession work he did for his son, Justin Hammett. Van Cleve was not otherwise employed. The Nebo Road residence is a small, one-story, three-bedroom house. A floor plan of the house and photos of the interi- or taken the day of the events giving rise to this suit are attached as an appendix to this opinion.[1] Hammett and Van Cleve covered all the windows and the front door with sheets of plastic and blankets, which they affixed to the walls with packing tape. See Appendix at 11-14, 16, 18-19. They did not typically keep the lights on in the living room, kitchen, or hallway. Because the front door was sealed with tape, the family used the carport door for entry and exit. See id. at 3-5, 11, 14. The carport door leads into the' kitchen and dining area, which is Connected to the family room and from there the rest of the house by an archway. See id. at 1, 5-8, 12, The family hung a blanket in the archway for climate control purposes. See id. at 7-8. As a result of these measures, there was very little natural or artificial light in the interior of the house. B. Van Cleve’s Drug Activity In October 2012, Van Cleve was addicted to methamphetamines. She had smoked meth regularly since the early 1990s, resulting in multiple convictions and various stints in prison. Van Cleve also frequently smoked marijuana. She was the only chronic drug user in the household. Hammett and Van Cleve used meth together in the mid-1990s and were incarcerated for doing so. Hammett had not used meth since, though at the time of his death he was taking oxycodone, and other medications as directed by a doctor to treat his many health problems. Clyde stayed, away from drugs entirely. C. The Search Warrant Van Cleve’s meth use led to the events giving rise to this lawsuit. She was able to sustain her habit at no cost by having the drug “fronted” to her (i.e., receiving the meth without having to pay up front), selling a portion at a markup, and keeping the remainder for .her own consumption.' Van Cleve’s drug activity eventually attracted the attention of law enforcement. Joey Horsley (Horsley), an agent with the Paulding County Sheriffs Office assigned to the Haralson-Paulding Drug Task Force, received information over the course of the several months preceding the incident that Van Cleve was selling meth from the carport of the Nebo Road residence. Horsley recruited a confidential informant to make a controlled purchase from her. The informant did so, successfully obtaining forty dollars’ worth of meth from Van Cleve, which was recorded op video. Horsley subsequently applied for a warrant to search the house and on October 16, 2012, he obtained it. Horsley expected Van Cleve was a small-time dealer but thought that he might be able to track down her supplier by searching the house. D. The Search The search took place on Wednesday, October 17, 2012. At around 2:15 p.m., Horsley briefed the search team at the Paulding County Sheriffs Office. He advised the agents and deputies that the target of the search was Van Cleve and that there was no intelligence as to whether firearms were present at the house. As they prepared to execute the search warrant, the officers met in the parking lot of a grocery store near the Nebo Road residence. Members of the search team donned tactical bullet-proof vests, each bearing the designation “SHERIFF” or “POLICE” in large letters on the front and back. Among the group of officers were Nathalie Whitener (Whitener) and Joseph Mayfield (Mayfield), defendants-appellees in this case. Whitener wore a vest similar to Horsley’s, with identical identifying markers, including the word “SHERIFF” emblazoned on the front and back in large letters. Officers Brian Rutherford (Rutherford), Mike Blackmon, Seth Cook, Scott Veal, and Jimmy Motes, none of whom are defendants in this case, accompanied Horsley, Whitener, and May-field to execute the search warrant. All of the officers wore police gear or uniforms easily identifying them as law enforcement. After the briefing, the officers drove to the Nebo Road residence in multiple marked and unmarked police cars and parked the vehicles in the driveway at around 3:15 p.m. Horsley did not anticipate any violent resistance from Van Cleve and the warrant did not contain a no-knock clause, so he and the other officers approached the house in an unhurried manner. When Horsley reached the carport door, he began knocking and announcing “Sheriffs Office, search warrant” in a loud but non-yelling .voice. See Appendix at 3, 5. The other officers, including Whitener, May-field, and Rutherford, lined up behind Horsley next to the door in a “stack” as Horsley repeatedly knocked and announced “Sheriffs Office,” which continued for between fifteen and thirty seconds. No one inside the house answered. Having received no response, Horsley tried the doorknob and found it was unlocked. He called out “Sheriffs Office” again through the open door and asked if anyone was home. Still no one answered, so Horsley entered, followed by the other officers. The police had their firearms drawn and in the low-ready position, which is standard operating procedure in the execution of a search warrant in Paulding County. On entering the residence, the officers found it was very dark because there were no lights on in the kitchen, living room, or hallway, and there was no natural light because all the windows were covered.[2] The officers did not turn on any lights as they moved through the house.[3] The officers continued to call out “Sheriffs Office, search warrant” as they moved through the house. Still they received no answer. The officers cleared the kitchen. See id. at 5-7. Horsley, followed by Whitener and Rutherford, moved through the blanket-covered opening into the living room. See id. at 7-8 (showing the blanket on the floor and the doorway in which it hung during the search). Horsley turned to the left toward a hallway leading to the home’s bedrooms and bathroom. He waited there facing the hallway for about five seconds, and again announced the officers’ presence. See id. at 9-10. Whitener turned to the right to face the front door area, see id. at 11, 14, and Rutherford turned further to the right to inspect an area in the far right-hand corner of the living room, see id. at 13. Horsley heard voices coming from down the hallway. The events that transpired next are the focus of the present dispute. In determining whether the officers were entitled to summary judgment, we must view the facts and make all reasonable inferences in the light most favorable to Plaintiff. In order to determine whether a material dispute exists, we begin by recounting the relevant evidence from each of the pertinent sources in detail as it appears in the record. 1. Testimony of principal witnesses a. Horsley According to Horsley, as he stood facing the hallway, he could see a light coming from inside the computer room. See Appendix at 9-10. Watching the hallway, he saw a shadow emerge. Horsley announced again that he was from the Paulding County Sheriffs Office. A large man came out of the room and turned toward Horsley.[4] The man, who turned out to be Hammett, stopped for a second and Horsley saw that his hands were tucked into his waistband area. Horsley then saw him move something from his left hand to his right hand in a manner that concealed what he had. The flashlight attached to Horsley’s pistol was illuminated and he pointed it at Hammett’s waistband, announcing “Sheriffs Office, let me see your hands” as he did so. Horsley then decided he needed to get Hammett to the ground so the other officers could move through the hallway and secure the rest of the house so that it could be searched. Hammett did not obey Horsley’s command to raise his hands, however, and made no verbal reply. Instead, Hammett stepped suddenly toward Horsley, sliding his body against the wall to Horsley’s left (Hammett’s right) in an apparent attempt to move around him. As he approached, Horsley dropped his firearm slightly, took a small step toward Hammett, and reached out his left hand toward Hammett to begin to subdue him, but he did not touch Hammett. Hammett quickly moved his right hand toward the left side of Horsley’s head. As he did so, Horsley caught a brief glimpse of a shiny black object in Hammett’s hands. Horsley thought Hammett was ambushing him with a weapon, and he responded by raising his firearm and shooting toward Hammett. Hammett cried out loudly in response to being hit by Horsley’s bullet. As Horsley fired, he lurched backward to avoid Hammett’s attack and fell. While he was falling, he heard two more shots in rapid succession and he feared that Hammett was the shooter. All of the foregoing occurred in a matter of seconds. After hearing the shots, Horsley scrambled backward, yelled for the other officers to get out of the house, and quickly exited the residence. b. Whitener The events unfolded in a similar manner in Whitener’s telling. According to Whitener, as Horsley was looking down the hallway, Whitener was facing to the right into the living room. See Appendix at 11-14. Whitener heard Horsley say “show me your hands” or “let me see your hands” and immediately turned' to the hallway to see what was happening. As Whitener looked, she saw Hammett facing in the direction of the officers, with his hands down near his waist as if to conceal something, disobeying the command to show his hands. Hammett said nothing in response to Horsley. Whitener also had a flashlight attached to her pistol, which she pointed at Hammett, attempting to determine what Hammett was carrying. After being ordered to do so again, Hammett still did not show his hands. Instead, in Whitener’s words, Hammett “stepped .over towards the right side of the hall and just started walking at us at a fast pace,”, still “not showing his hands,” and “like hugging, basically hugging the wall.” Whitener observed Horsley attempt to grab Hammett, and then saw Hammett suddenly reach up with his hands toward Horsley’s face in an aggressive.manner. She then heard a gunshot and saw Horsley lurch backward and begin to fall. Whitener immediately fired her weapon toward Hammett, who she feared was attempting to harm Horsley and had possibly shot him. As she fired, Hammett twisted to his right and it appeared to her that the shot hit him in the lower left side of his back. Whitener expressed some uncertainty in her deposition as to whether she or Horsley shot first and whether it was her bullet or Horsley’s that struck Hammett’s torso. However, she was clear that the shots were nearly simultaneous, within a second or a half-second of one another. As Horsley began yelling for the officers to get out of the house, Whitener fell backward into the living room and .hid behind the couch near the front door. See id. • at 14. She did not exit the resi-. dence, but remained hidden, listening to whispers between the remaining occupants and fearing for her life. Later, when the house was secured, Whitener was able to leave the building. c. Rutherford Rutherford, who is not a defendant in this case, provided the only other eyewitness account. According to Rutherford, as the officers entered the living room, he already had the flashlight on his firearm activated because it was dark and he could not see. He turned to the right toward the corner of the house, toward the end of the couch where a pile of clutter lay. See Appendix at 13. He thought the area was large enough for someone to be hiding there, based on the way the shadows were cast. Rutherford then heard Horsley say “show me your hands” or “let me see your hands.” Shortly thereafter, Rutherford heard a gunshot. Rutherford pivoted to his left and his flashlight illuminated the words “SHERIFF” on the back of a tactical vest. He then heard another shot and saw a flash in front of the officer wearing the vest. After he heard that shot, the person wearing the vest—Rutherford did not yet recognize which officer it was—fell to the ground.[5] As he looked to the ground, Rutherford recognized the officer was Horsley. He thought Horsley was hurt. He grabbed Horsley and helped him exit the building. Rutherford testified that the only officer he saw was Horsley; he did not know where Whitener was at the time. After reaching down to help pick up Hors-ley, Horsley told him to get out, and Rutherford exited the building. d. Van Cleve Van Cleve was at home and admits she was under the influence of meth when the officers arrived.[6] She usually smoked meth and marijuana in the computer room, which is where she was when Hammett came home earlier that afternoon. See Appendix at 1 (showing the computer room as “Bedroom #2,” the first door in the hall on the right); id. at 10, 16 (photographs of the hallway and computer room). Van Cleve and Hammett were sitting in the computer room talking when they heard the officers announce “Paulding County Sheriff’s Office, search warrant.” The announcement sounded as if it came from the carport area.[7] Van Cleve and Hammett sat in the computer room for thirty seconds or so trying to figure out what to do. Then, Hammett got up and went out into the hallway while Van Cleve dashed straight across the corridor to the bathroom, intending to flush' her meth down the toilet. She heard a male voice say “show me your hands” and “put your hands in the air.” Van Cleve’s deposition testimony is confusing, perhaps because, as she admits, she was under the influence of methamphetamines when the shooting occurred.[8] It is clear, however, she agrees a total of three shots were fired within the span of a few seconds. Van Cleve froze when she heard the first shot, failing to dispose of her drugs. When the officers exited the building, Van Cleve ran back and forth between the bathroom and the computer room in a state of shock. She was still carrying her meth when she was placed in a patrol car outside, but she was able to free her hands and swallow the drug while she was in the police car so that it would not be found. Van Cleve’s testimony shed little light on what Hammett may have had in his hands when he left the computer room. In an interview conducted the day of the incident, of which the record contains only a summary, Van Cleve stated that Hammett was holding a clipboard when he left the computer room. At her deposition, however, she was unable to recall whether Hammett had anything in his hands, speculating that he may still have' been carrying paperwork with which he had entered the room. When shown a picture of a bottle of pepper spray found in the hallway after the shooting, Van Cleve neither confirmed nor denied it was Hammett’s. See id. at 20. She acknowledged Hammett owned pepper spray but she was not sure if he had it in his hands when he went out into the hallway, and she did not remember seeing the pepper spray in the hallway after the shooting. e. Clyde At the time of the shooting, Clyde was in his bedroom at the end of the hallway playing video games with headphones on one ear and his bedroom door shut. See Appendix at 1 (showing Clyde’s room as “Bedroom #3”); id. at 10, 17, 19 (photographs of the hallway, the end of the hallway, and Clyde’s room). He had come home from school about forty-five minutes earlier and gone straight into his room and closed the door. Clyde did not hear his father arrive at the house, nor did he hear any police pull up. While he was playing, he heard a male voice yell “Sheriffs Office.” Clyde threw off his headphones, and then later heard a voice say “show me your hands.” Then he heard two gunshots “one right after another,” within a second or two of each other. He did not hear Hammett, Van Cleve, or anyone else say anything during this time period. After hearing the shots, Clyde opened his door and went out into the hallway. He saw Hammett lying against the wall in the hallway next to the computer room about midway between the door opening and the corner of the living room, with his legs toward the living room and his head toward the bedrooms. See id, at 10 (showing a bloodstain on the right wall of the hallway). Clyde did not see anything in his father’s hands. Hammett was not able to say anything to Clyde. Clyde saw blood coming from his father’s shirt, so he knew he had been shot. At that point, because he was scared, Clyde returned to his bedroom. He later emerged at the command of a police officer, and was briefly placed into custody. Clyde confirmed that Hammett usually carried a can of pepper spray for use in his repossession work and that he would keep the pepper spray in his pocket. He also agreed that the can of pepper spray shown in the incident photographs was Hammett’s and that it was found by Hammett’s body, though he did not see it there when he first went into the hallway. See id. at 20. 2. Other evidence a. Facts pertaining to Mayfield The parties agree the single shot May-field fired did not strike Hammett and was discharged after Hammett had already been hit by the first two bullets. Mayfield was part of the search team and entered the kitchen from the carport behind Hors-ley and Whitener. As Mayfield followed Horsley and Whitener into the building, Mayfield got “hung up” in the doorway between the kitchen and the living room, in which a blanket was hanging. See Appendix at 7-8 (showing the blanket on the floor and the doorway in which it was hung). Mayfield heard two gunshots and then turned and saw Horsley fall to the ground. He believed Horsley had been hit. After he heard the shots fired, he discharged one round from the kitchen in the general direction of the perceived threat, though he did not see Hammett and did not know who had fired the two shots. His bullet was never recovered, though there is some evidence that it may have actually struck the back of Whitener’s bullet-proof vest. b. The autopsy report Hammett’s autopsy report shows that although shorter than average, Hammett was a large man. He stood five feet six inches tall and weighed 241 pounds. The report describes two wounds. The fatal wound was a gunshot to the torso. The wound of entrance was found on the back-left side of the torso, eight centimeters to the left of the midline and fifty-three centimeters from the top of the head. The bullet followed a left-to-right, back-to-front and slightly downward direction through Hammett’s torso. The projectile did not exit the body, but caused a bruise on Hammett’s abdomen three centimeters to the right of the midline and fifty-eight centimeters from the top of the head. The second wound was a grazing laceration on the lateral aspect of the left index finger, also caused by a bullet. c. Certain material facts on which the parties agree The parties agree that three shots were fired: one by Horsley, one by Whitener, and one by Mayfield. All agree Mayfield’s shot was the last of the three and did not strike Hammett. The parties also agree the first shot grazed Hammett’s left index-finger and lodged in the wall next to the bathroom door frame fifty-two inches above the floor. See Appendix at 21. Nor is there any dispute that the second shot entered the back-left side of Hammett’s torso and killed him.[9] E. Procedural History Plaintiff brought this suit as the administrator of Hammett’s estate against Hors-ley, Whitener, and Mayfield, as well as Paulding County and the City of Dallas, Georgia, and certain other defendants. He alleged violations of the Fourth Amendment and asserted state law tort claims. The district court granted summary judgment to the defendants on all claims. The court determined the actions of Horsley and Whitener were objectively reasonable in light of the circumstances and therefore granted qualified immunity. It also determined that Mayfield was entitled to summary judgment because his bullet did not strike Hammett, so Mayfield did not seize Hammett within the meaning of the Fourth Amendment. The court did not address whether the law was clearly established in either case because it found no violations in the first place. Plaintiff appeals the judgment of the district court-only with respect to his Fourth Amendment excessive force claims against Hors-ley, Whitener, and Mayfield, contending the district court erred in granting qualified immunity. H. STANDARD OF REVIEW We review the district court’s grant of qualified immunity to Horsley, Whitener, and Mayfield de novo. Dukes v. Deaton, 852 F.3d 1035, 1041 (11th Cir. 2017), petition for cert. filed, — U.S. —, 138 S.Ct. 72, 199 L.Ed.2d 23. III. DISCUSSION A. Qualified Immunity Generally The Supreme Court has long held that government officials are entitled to a form' of immunity from civil suits for damages. See Nixon v. Fitzgerald, 457 U.S. 731, 744, 102 S.Ct. 2690, 2698, 73 L.Ed.2d 349 (1982). It has often recognized that immunity, whether qualified or absolute, is rooted in the long tradition of the common law. See Harlow v. Fitzgerald, 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982); Nixon, 457 U.S. at 744, 102 S.Ct. at 2698; see also Spalding v. Vilas, 161 U.S. 483, 494, 16 S.Ct. 631, 635-36, 40 L.Ed. 780 (1896). As the Court recently explained, At common law, government actors were afforded certain protections from liability, based -on the reasoning that “the public good can best be secured by allowing officers charged with the duty of deciding upon the rights of others, to act upon their own free, unbiased convictions, uninfluenced by any apprehensions.” Filarsky v. Delia, 566 U.S. 377, 388, 132 S.Ct. 1657, 1661-62, 182 L.Ed.2d 662 (2012) (quoting Wasson v. Mitchell, 18 Iowa 153, 155-56 (1864)). The same considerations of the public good that motivated common law protections have driven the development of official immunity even as it has evolved beyond the contours of the common law. See Spalding, 161 U.S. at 498, 16 S.Ct. at 637 (“It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of the government, if he were subjected to any such restraint [as a civil suit for damages].”); Anderson v. Creighton, 483 U.S. 635, 644-45, 107 S.Ct. 3034, 3041-42, 97 L.Ed.2d 523.(1987) (“Although it is true that we have observed that our determinations as to the-scope of official immunity are made in the light of the common-law tradition, we have never suggested that the precise contours of official immunity can and should be slavishly derived from the often arcane rules of the common law.” (citation and quotation omitted)). The prudential judgment embodied in qualified immunity represents a “balance between ... evils” in the protection,of the citizenry. Harlow, 457 U.S. at 813, 102 S.Ct. at 2736. On the one hand, permitting injured citizens to sue for damages “may offer the only realistic avenue.for vindication of constitutional guarantees.” Id. .On the other, it is essential that the law protect public officials so that they can “carry out their discretionary duties without the fear of personal liability or harassing litigation.” Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). The satisfaction of individual grievances must be balanced against the societal harm that would result from allowing lawsuits to proceed- against public servants unchecked. In service of this end, the doctrine permits officials to faithfully perform their duties without being second-guessed. It “recognizes the problems that government officials like police officers face in performing their jobs in dynamic and sometimes perilous situations.” Mirricks v. Adkisson, 785 F.3d 553, 558 (11th Cir. 2015). The individual benefit to an officer is both prospective and retrospective. Before any' alleged civil rights violation occurs, a pólice officer is free to address the'needs of situations as they arise in-the course of his duties unfettered by excessive liability concerns. If, however, the official has been involved in an incident that could give rise to liability, qualified immunity ensures only meritorious claims will proceed to trial so that the officer can continue to serve the public unimpeded. This-is an important virtue of a robust qualified immunity; standard because “a pending civil rights lawsuit is a sword of Damocles ... seriously impeding the official in the performance of his duties.” Green v. Brantley, 941 F.2d 1146, 1150 (11th Cir. 1991) (en banc). “Avoidance of distraction to public officials [is] one of the main purposes of the qualified immunity doctrine.” Id. So strong is the public interest in protecting government officials in the reasonable discharge of their duties that such officials are insulated not only from damages, but even from the costs of going to trial; for this reason, in most instances interlocutory appeal of district court decisions denying qualified immunity is permitted. See Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (“One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit.”); Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (“[Qualified immunity] is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.”). Indeed, in Harlow v. Fitzgerald, the Supreme Court refashioned the qualified immunity standard with the,express intention of reducing the- number of suits that would go to trial; it did so by ceasing ,to inquire as to the. officer’s subjective state of mind and instead measuring the conduct against an objective reasonableness standard. Harlow, 457 U.S. at 815-16, 102 S.Ct. at 2737 (“The subjective element of the good-faith defense frequently has proved incompatible with our admonition ... that insubstantial claims should not proceed to trial.”); cf. Merricks, 785 F.3d at 558 (“[Qualified immunity] is also designed ... to provide a direct way to end insubstantial claims on summary judgment.”). Although these safeguards work to the benefit of individual officers, they exist for the sole purpose of protecting the public at large. Indeed, suits against officials “frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole.” Harlow, 457 U.S. at 814, 102 S.Ct. at 2736. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will “dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.” Id. (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)). In sum, a balance must be struck between the harm to individuals aggrieved by official misconduct and the harm to society resulting from a shackled executive apparatus. Qualified immunity is the path the courts have chosen. B. Excessive Force The origins and purposes of qualified immunity remind us that although the circumstances of a case may be singularly unfortunate, regrettable facts do not automatically spell personal liability for police officers. We are bound to apply the Reasonableness standard set forth by the Supreme Court and this Court.' In the present litigation, there is no dispute the officers’ conduct was discretionary, so Plaintiff must show the officers violated Hammett’s constitutional right and that the right was clearly established at' the time. See Perez v. Suszczynski, 809 F.3d 1213, 1218 (11th Cir. 2016). We need not address the question of clearly established law because Plaintiff has not shown a constitutional right was violated. Thus qualified immunity turns on whether the officers used excessive force, as alleged. “Any claim that a law enforcement officer used excessive force—whether, .deadly or- nob—during .a seizure of a free citizen must be analyzed under the Fourth Amendment’s ‘reasonableness’ standard.” Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009) (citing Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)). Determining whether the force used is reasonable “requires balancing of the individual’s Fourth Amendment interests against the relevant .government interests.” Cty. of Los Angeles v. Mendez, — U.S. —, 137 S.Ct. 1539, 1546, 198 L.Ed.2d 52 (2017) (citing Graham, 490 U.S. at 396, 109 S.Ct. at 1871). “The operative question in excessive’force cases is ‘whether the totality of the circumstances justified] a particular sort of search or seizure.’ ” Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985)). As the Supreme Court recently summarized, The reasonableness of the use of force is evaluated under an objective inquiry that pays careful attention to the facts and circumstances of. each particular case. And the ‘reasonableness’ of a particular use of force must be judged from the p.erspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Excessive force claims ... are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred. That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim. Id. at 1546-47 (citations and quotations omitted). Reasonableness is the touchstone for all excessive force claims, regardless of whether the force used was deadly. See Garczynski, 573 F.3d at 1166. “As to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm.” Singletary v. Vargas, 804 F.3d 1174, 1181 (11th Cir. 2015). “We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has ‘probable cause to believe that his own life is in peril.’ ” Id. (quoting Robinson v. Arrugueta, 415 F.3d 1252, 1256 (11th Cir. 2005)); see also Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013) (“In the deadly force context, we have observed that a police officer may constitutionally use deadly force when the officer ... has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others ....” (quotation omitted)). 1. Horsley and Whitener Plaintiffs sole argument with respect to Horsley and WTiitener, repeated in various forms throughout his brief, is that based on the physical evidence and testimony taken in the light most favorable to Plaintiff, a jury could reasonably find that Horsley and Whitener fired on- Hammett without justification when he was not a threat to them. In order to sustain this contention, Plaintiff asserts a jury could find the following facts. First, Hammett raised his hands in surrender when Hors-ley told him to do so. At that moment, Whitener fired without justification, her bullet grazing Hammett’s left index finger. Wounded and terrified, Hammett turned in full retreat, at which point Horsley shot Hammett in the back in cold blood. Plaintiff insists that the evidence supports this story. In rejecting it, he contends, the district court resolved questions of material fact in favor of the officers. If the evidence could legitimately be interpreted as Plaintiff insists it can, the officers’ use of force might have been excessive. Plaintiff’s arguments fail, however, because no reasonable jury could make out his theory on the evidence in the record. Plaintiffs attempts to show otherwise stretch the summary judgment standard far beyond its breaking point. Summary judgment is appropriate “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to'judgment as a matter of law.” Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). “A genuine dispute requires more than ‘some metaphysical doubt as to the material facts.’ ” Garczynski, 573 F.3d at 1165 (quoting Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007)). The fact that the record contains anything at all in support of the nonmovant’s position is not dispositive; a “genuine” dispute requires that the evidence is such that a reasonable jury could find for the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (“The mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.”). Although all reasonable inferences are to be drawn in favor of the nonmoving party, “an inference based on speculation and conjecture is not reasonable.” Ave. CLO Fund, Ltd. v. Bank of Am., N.A., 723 F.3d 1287, 1294 (11th Cir. 2013) (quotation omitted). The Supreme Court has instructed that “[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.” Scott, 550 U.S. at 380, 127 S.Ct. at 1776. In this case, voluminous uncontradicted evidence stands completely at odds with Plaintiffs theory of surrender and retreat. Taking all facts and making all reasonable inferences in the light most favorable to Plaintiff, the following facts remain undisputed. The officers knocked and announced before entering the residence but no one responded. Then, while moving through the house, they continually announced their identity and their purpose, still to no response. Clyde confirmed he heard the police identify themselves. In addition, Van Cleve testified and it is undisputed that she and Hammett heard the police announce themselves and remained in the computer room for some time trying to decide what to do. The officers moved through the house, which was very dark even at the height of the afternoon because there were no lights on and all of the windows were covered with opaque materials. When Hammett came out of the computer room, Horsley clearly and audibly ordered him to show his hands. This, too, was confirmed by Van Cleve. Both officer eyewitnesses testified Hammett refused to comply, and there is no evidence to suggest otherwise—Van Cleve did not hear Hammett say anything in response to Horsley to indicate submission, nor did Clyde or any of the other officers. Instead, Hammett aggressively approached Hors-ley with an unidentified object in his hands, which he moved toward Horsley’s face. Whether the object ultimately turned out to be Hammett’s clipboard or his pepper spray is immaterial; in the tense and uncertain moments leading up to the shooting, a reasonable officer could have believed it to be a weapon, especially given dim lighting and the way Hammett handled it. Horsley and Whitener fired in response, and regardless of who shot first, the sounds of the gunshots occurred in rapid succession. Finally, the bullet that killed Hammett entered the back-left side of his torso and caused a bruise on the right side of his stomach, traveling diagonally through his body. None of these critical facts is disputed by affirmative evidence. Several are inconsistent with the surrender-and-retreat theory, most obviously, the officers’ testimony that Hammett charged at Horsley. In addition, the two shots that struck Hammett occurred in rapid succession, which would not leave time for a retreat in the split second between them. Furthermore, if Hammett were retreating back down the hallway when he was shot, the bullet would have traveled straight through him, not diagonally from left to right, which would have been impossible. “Though factual inferences are made in [Plaintiffs] favor, this rule applies only ‘to the extent supportable by the record,’ ” Penley v. Eslinger, 605 F.3d 843, 853 (11th Cir. 2010) (quoting Scott, 550 U.S. at 381 n.8, 127 S.Ct. at 1776 n.8), and Plaintiffs theory cannot be reconciled with it. Even if we were to set the undisputed contradictory evidence aside, the mere fact that the record, when viewed in the light most favorable to Plaintiff, is theoretically not inconsistent with his narrative, is not enough to survive summary judgment. Holding all of the contrary (and uncontradicted) evidence aside, Plaintiff has not pointed to any affirmative evidence that Hammett surrendered and retreated.[10] See Anderson, 477 U.S. at 257, 106 S.Ct. at 2514 (“[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.”). The assertion that he did is pure speculation. See Ave. CLO Fund, 723 F.3d at 1294. The bullet hole in the wall and the location of Hammett’s wounds, by themselves, tell us essentially nothing about what happened. There are infinite possible permutations that would explain how the bullets ended up where they did during the brief and chaotic scuffle that occurred. Plaintiff is required to point to evidence that would support his theory, but he cannot. Instead, all of the available evidence refutesit. Indeed, the undisputed facts show the officers did not act unreasonably. Singletary, 804 F.3d at 1181; Garczynski, 573 F.3d at 1166. “In excessive force cases, we are mindful that officers make split-second decisions in tough and tense situations,” Morton, 707 F.3d at 1281, and that “the ‘reasonableness’ of a particular use of force must be judged from'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,” Mendez, 137 S.Ct. at 1546 (quotation omitted). From this perspective, the facts show the following. The officers entered a dark and cluttered house after knocking and announcing for some time. As they moved through the building, they continually announced they were from the Sheriffs Office and they were executing a warrant, to no response. All of the sudden, a large man appeared in the hallway, saying nothing to the officers and giving no indication that he intended to cooperate even though the officers knew that he must have heard their announcements. Instead, he refused to obey their commands to show his hands, shifted an object between his hands, and rapidly approached them, drawing the object up toward the face of the lead officer. In the darkness, given, the foregoing circumstances, the officers had probable cause to believe it was a weapon and that Hammett intended to use it.[11] See Perez, 809 F.3d at 1220 (holding that “the presence or absence of a weapon-is a factor in this [excessive force] analysis,” though the inquiry must nevertheless consider the totality of the circumstances); Penley, 605 F.3d at 853 (holding that an officer had “probable cause to believe his own life was in peril” where the' suspect “was not responding to the negotiator’s questions; he did not comply with commands to drop his weapon; and he pointed his weapon” at the police (quotation omitted)). It was not unreasonable of them to believe Hammett posed a threat of serious physical harm and to respond accordingly. Singletary, 804 F.3d at 1181. We are “loath to second-guess decisions made by police officers in the field,” Penley, 605 F.3d at 854 (quotation omitted), and we will not do so here. Though we acknowledge the present inquiry requires Us to “slosh our way through the factbound morass of ‘reasonableness,’” Scott, 550 U.S. at 383, 127 S.Ct. at 1778, such that each case will be somewhat unique, there are valuable lessons to be gleaned from our prior decisions, in particular, that of Garczynski v. Bradshaw. There, during an encounter with his estranged wife, John Garczynski manifested an intent to kill himself, and then disappeared. Garczynski, 573 F.3d at 1161. Reaching him on the phone, his wife learned he had á gun with him and planned to commit suicide. Garczynski’s wife contacted the police and she stayed on the line with Garczynski trying to calm him down. Id. By triangulating the cell phone call, the police found Garczynski’s car. Id. at 1162. Unbeknownst to the officers at the scene, at the direction of a police officer accompanying her. Garczynski’s wife instructed him to start the car. Id. at 1163. The police, however, had orders not to let Garczynski leave. Id. Believing Garczynski’s departure would create a dangerous situation, the officers ran to the car, banged on the windows, and tried to open the passenger door, attempting to get Garczynski out. Garczynski raised his gun, which the officers ordered him to drop. Id. Garczynski disobeyed the command, instead swinging the gun around toward one of the officers, at which point the police shot and killed him. Id. at 1164. The case has parallels to this one. There, as here, “the escalation into deadly force was justified by [the decedent’s] refusal to comply with the officers’ commands.” Id. at 1168. Much as Horsley did in this case, in Garczynski, “[a]fter identifying themselves, the officers repeatedly ordered Garczynski to show his hands.” Id. Instead of obeying these commands, Garczynski swung the gun from his head in the direction of the officers, at which point they fired. The officers reasonably reacted to what they perceived as án immediate threat of serious harm to themselves. This is exactly the type of “tense, uncertain and rapidly evolving” crisis envisioned by the Supreme Court. Judged from the perspective of á reasonable officer on the scene, the officers’ use of deadly force was objectively reasonable under the circumstances. Id. (citation omitted). The same reasoning applies in- the present analogous,- though obviously not identical, situation. The undisputed testimony establishes that, like Garczynski, Hammett was carrying something and disobeyed an officer’s instruction to show his hands. After refusing to show his hands, Hammett moved aggressively toward Horsley and raised-his hands rapidly toward Horsley’s face. “Non-compliance of this sort supports the conclusion that use of deadly force was reasonable.” Penley, 605 F.3d at 851. We acknowledge that here, unlike Garczynski, it turned out that Hammett was not armed with a deadly weapon. Nevertheless, we must view the situation from the perspective of a reasonable officer in Horsley’s and Whitener’s position. See Mendez, 137 S.Ct. at 1546. From that vantage point, after the officers repeatedly announced their presence to no response in a dark house occupied by a known meth dealer, Hammett’s actions easily could have appeared to be an ambush. Under these circumstances, Horsley and Whitener had probable cause to believe Hammett posed a threat of serious physical harm to Horsley. Plaintiff, relying in large part on the testimony of Rutherford, makes much of the possibility that Whitener shot first, and insists that on the facts most favorable to him, we must assume that she did. Plaintiff contends Whitener’s justification for shooting was simply that she heard a gunshot and thought Horsley had been hit. Thus if in reality she discharged her weapon first, Plaintiff asserts, her theory of justification “goes out the window.” Brief of Appellant at 33. To the contrary, however, Whitener says she fired because Hammett was moving aggressively toward Horsley, not merely because she heard a gunshot. Indeed, she claims the entire sequence of events took place so quickly that she is not sure who shot first. Although Whitener conceded in her deposition that she theoretically could have shot first, fairly read, all of her testimony indicates she thinks she discharged the second shot. Similarly, there is nothing about the fact that Horsley may- have shot second that undermines his claim that he shot because Hammett charged at him. There is still no evidence that Hammett was submitting and retreating when he was shot, and nothing to create a dispute of material fact. See Garczynski, 573 F.3d at 1165 (“A genuine dispute requires more than some metaphysical doubt as to- the material facts. A mere scintilla of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.” (citation and quotation omitted)). Rather, the evidence shows the events took place quickly and chaotically. In addition, Plaintiff makes much of some alleged inconsistencies between Horsley’s and Whitener’s initial statements to the Georgia Bureau of Investigation, their depositions taken during discovery, and their sworn declarations attached to their motion for summary judgment. We have difficulty identifying such discrepancies and fail to see how they would be material in any case. But even assuming Horsley and Whitener provided inconsistent testimony at various stages of the proceedings, the Supreme Court has stated that “discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion.” Anderson, 477 U.S. at 256-57, 106 S.Ct. at 2514 (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984)). Rather, the plaintiff must present affirmative evidence. Id. at 257, 106 S.Ct. at 2514. Plaintiff has not done so. “With the plaintiffs best case in hand, the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute.” Robinson, 415 F.3d at 1257. The problem for Plaintiff is his best case does not involve Hammett surrendering and retreating. The facts taken in the light most favorable to him simply do not support it. Even where the alleged conduct would violate clearly established law, “the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.” Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815. Plaintiff has failed to uncover evidence sufficient to create a factual dispute as to whether the officers shot Hammett without justification. 2. Mayfield Mayfield was entitled to qualified immunity as well. As noted above, there is no dispute that Mayfield fired the third shot and that his bullet did not strike Hammett. The parties argue over the proper interpretation of two Sixth Circuit cases in attempting to determine whether Mayfield seized Hammett within the meaning of the Fourth Amendment. See Floyd v. City of Detroit, 518 F.3d 398 (6th Cir. 2008); Cameron v. City of Pontiac, 813 F.2d 782 (6th Cir. 1987). If Mayfield did not seize Hammett, it is argued, he cannot be liable for using excessive force. The parties neglect, however, this Circuit’s law on the subject, which is sufficient to dispose of the issue. We held in Carr v. Tatangelo that where police officers fire on an individual in alleged self-defense, but do not hit him or otherwise touch him, the individual has not been seized. 338 F.3d 1259, 1270-71 (11th Cir. 2003). In that case, an informant led police officers to a house suspected to be occupied by drug dealers. Id. at 1263. The informant was supposed to “have somebody come out with drugs for the officers to arrest,” but instead he entered the house and was not seen again. Id. As the officers lay in wait for him to reemerge, they hid behind bushes and trees to conceal their presence. Plaintiffs Romeo Carr and Cedrick Wymbs exited the house and Wymbs noticed movement in the bushes and the two began throwing rocks at the area where the officers were hiding, suspicious that there were individuals concealed there, as indeed there were. Id. The officers claimed that they heard someone chamber a bullet in a gun, so they opened fire on the two individuals. Id. at 1264-65. Their bullets struck only Carr, at which point both Carr and Wymbs fled into the house. Id. at 1265. Both individuals sued the police officers. Id. at 1266. We held that Wymbs was not seized “[b]ecause [he] was not shot or physically touched by the officers.” Id. at 1270-71. As such, he did not have a claim for excessive force under the Fourth Amendment. Rather, Wymbs’ claim was properly analyzed as a Fourteenth Amendment substantive due process claim. Id. To prevail on that cause of action, a plaintiff is required to show an “executive abuse of power” that “shocks the conscience.” Id. at 1271 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043 (1998)). Though ultimately we employed a reasonableness analysis “[similar to the standard used to evaluate Fourth Amendment excessive force claims,” id. (quoting Jones v. City of Dothan, 121 F.3d 1456, 1461 (11th Cir. 1997) (per curiam)), Wymbs bore “a higher burden to show a violation of substantive due process under the Fourteenth Amendment,” id. at 1272. We held Wymbs had not met it and granted qualified immunity on his claims. Id. at 1273-74. Plaintiff has not recognized, much less attempted to meet, this heightened burden with respect to Mayfield, and in any event he could not. Mayfield thought his fellow officers were under fire, having heard first Horsley’s commands that Hammett show his hands, without any response indicating submission, and then two quick bursts of gunfire. A reasonable officer in the situation would have probable cause to believe that the lives of his fellow policemen were in danger. There is no need to resort to foreign case law to find that Mayfield is entitled to qualified immunity. IV. CONCLUSION Hammett’s death is undoubtedly tragic. However, qualified immunity exists to protect public servants in precisely these circumstances. After discovery, Plaintiff has produced no evidence that suggests the “split-second judgments” of Horsley, Whitener, or Mayfield violated thp Fourth Amendment as they responded to the “tense, uncertain, and rapidly evolving” events of that day. Graham, 490 U.S. at 397, 109 S.Ct. at 1872. Summary judgment was appropriate, and they are to be spared the burden- of defending themselves at trial. The judgment of the district court is AFFIRMED. . The photos in the Appendix, taken the day of the incident, were included among many others in a Georgia Bureau of Investigation report, as was a floorplan of the house. The photos on pages 3 through 20 of the Appendix were verified by Clyde in his deposition as accurately and truthfully depicting .the house as it existed on the day of the incident. Clyde also verified the floorplan. Van Cleve'verified a smaller subset of the same group of photographs at her deposition. . Note that the pictures of the house in the Appendix were taken after the lights had been turned on. Van Cleve testified that the lights were on in the bathroom and the computer room only at the time the warrant was executed. . According to Whitener, police officers are trained not to turn lights on until after a building is secured because to do so would put the officers at risk by making them a target; instead, they are to use the flashlights attached to their pistols. . According to his autopsy report, Hammett weighed 241 pounds. . Deputy Jimmy Motes was not deposed, but his supplemental incident report indicates that he entered the living room and immediately heard two shots, then turned and saw Horsley falling backward.’' This is consistent with Rutherford’s testimony and Plaintiff's contention that both shots were fired before Horsley had fallen completely. . Though she did not specifically remember doing so, she also agreed she had possibly used cannabis that day as well, since a pipe containing half-smoked marijuana was found in the computer room. . In her deposition, Van Cleve does not recall how many times she heard the police announce their presence. . Van Cleve expressed a good deal of uncertainty as well as the inability to recollect many of the specifics of the incident, remarking that she “spent three years trying to forget that day.” . The ballistics report was inconclusive as to which gun fired the bullet that struck Hammett in the back. . The tragedy of Hammett’s death is doubly regrettable insofar as he is. unavailable to testify on his own behalf. Nevertheless, as a ' -result, evidence sufficient to defeat a motion for summary judgment must come from othér sources. Here, we have the benefit of the testimony of Hammett’s wife and son, who were both present at the time of the incident. Still, neither of them testified to anything that would challenge the officers’- version of the facts. In the end, Hammett's misfortune does nothing to change the fact that no jury cottld reasonably find for Plaintiff on this evidence. . Although we hold Horsley and Whitener had actual probable cause, they could prevail even if they did not, for "an officer need only have arguable probable cause, not actual probable cause, in order to qualify for immunity from a Fourth Amendment claim,” Garc-zynski, 573 F.3d at 1167. That is, if the officer "reasonably could have believed that probable cause, existed, in light of the information the officer possessed,” then the officer did not commit a constitutional violation. Id. (quoting Montoutev. Carr, 114 F.3d'181, 184 (11th Cir. • 1997)). As we have often recognized, “the qualified immunity standard is broad enough to cover some mistaken judgment.” Id.