[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15294

_____

D.C. Docket No. 4:17-cv-00018-HLM


LEVI WILSON,
DARIS WILSON,
as Surviving Children of Darren Billy Wilson, Deceased,
and as Personal Representatives of the Estate of Darren Billy Wilson,

Plaintiffs-Appellants,

versus

DEPUTY ANTHONY PARKER,
in Both His Individual and Official Capacities,
DEPUTY NICK THOMPSON,
in his Official Capacity Only,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 17, 2018)

Before ED CARNES, Chief Judge, and BRANCH and FAY, Circuit Judges.

PER CURIAM:

This case stems from a tragic encounter between Darren Billy Wilson and Bartow County Deputy Sheriffs Anthony Parker and Nick Thompson. The deputies responded to a call about a disturbance in the woods behind a home in Bartow County, Georgia. When they arrived they could hear strange noises in the woods and headed in that direction using a procedure called "contact and cover."[1] Thompson took the lead and had his taser drawn; Parker followed and had his firearm drawn. They ultimately came upon Wilson who was sitting in the woods in only his underwear screaming at someone or something that was not there. Upon seeing the deputies, Wilson rose, grabbed a stick, and charged Thompson. Parker, fearing Thompson was in danger, fired at Wilson resulting in his death.

The plaintiffs are the surviving children of Wilson and have brought claims against the deputies under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and state law. The district court granted summary judgment on the § 1983 claim because Parker was entitled to qualified immunity. The district court also determined the plaintiffs failed to make the requisite showing with respect to their ADA and Rehabilitation Act claims, and the

---

[1] Under this procedure, the "contact officer," armed with a non-lethal method of force, tries to make initial contact with the suspect. The "cover officer" uses a lethal method of force if necessary to protect the contact officer from being assaulted.

state law claims failed on the merits.  On appeal, the plaintiffs assert our precedent establishes Parker violated Wilson's clearly established constitutional right to be free from deadly force.  They also contend the district court erred by concluding Wilson was not a qualified individual with a disability.  Finally, they argue Parker was not entitled to official immunity on the state law claims.

While Wilson's death was undoubtedly tragic, we conclude Parker did not violate his Fourth Amendment rights.  Additionally, the plaintiffs fail to address several of the district court's grounds for granting summary judgment with respect to their ADA, Rehabilitation Act, and state law claims.  Accordingly, we affirm.

## I. BACKGROUND

### A. Uncontested Facts

On July 21, 2015, Parker and Thompson responded to a call stating that it sounded like two men were fighting in the woods behind the caller's house.  Parker and Thompson began searching the woods using the procedure called "contact and cover," described above.

Thompson made initial contact with Wilson, a 47 year-old man with a history of bipolar disorder, paranoid schizophrenia, and methamphetamine abuse.  Wilson, who was dressed in nothing but his underwear, was sitting on the ground with his back to the deputies and screaming at someone or something that was not there.  Thompson commanded Wilson to show his hands.  Instead, Wilson stood up

3

and approached Thompson.  Parker subsequently fired five shots, three of which struck Wilson.  One shot hit Wilson in his "mid back," proceeding right to left and "slightly back to front."  Another shot hit him in his right lower back, proceeding right to left "with minimal front to back deviation."  A third bullet struck Wilson's right thigh.  Wilson died as a result of the gunshots.  He was "acutely intoxicated by methamphetamine" at the time of his death.  In total, about eleven seconds passed between Thompson's first command and Parker's first shot.

## B. The Deputies' Account

Other than the facts described above, the parties dispute what occurred on July 21, 2015.  According to the deputies, when Thompson made contact with Wilson, Wilson was sitting on the ground, holding a stick in his lap.  Upon standing, Wilson charged Thompson in "an aggressive state," holding the stick diagonally across his body in a "port arms" or "parade rest" position and yelling at the top of his lungs.  Thompson continued to instruct Wilson to show his hands. Wilson never raised the stick or pointed it at Thompson but continued to charge. Thompson backed away from Wilson as Wilson came toward him, but Wilson moved faster than Thompson could back up.  Thompson froze and did not use his taser because he "didn't have a shot."  He said Parker's first name three times, calling for assistance.

4

When Thompson first made contact with Wilson, Parker did not see them. As Parker started to make his approach, he saw Wilson moving toward Thompson, holding a stick or branch. Although Parker had pepper spray, he believed that it was not a good option because he was not close enough, and it sprayed in a cone and therefore would have affected Thompson as well. Parker responded to Thompson's call for help by firing at Wilson, though he would have shot even if Thompson had not said his name. Wilson fell approximately eight to ten feet from Thompson.

The stick broke underneath Wilson as he fell. A Georgia Bureau of Investigation ("GBI") agent testified that the stick, which was approximately five and one-half feet long,[2] was fragile and came apart as he picked it up. No tests were done to determine whether there was any trace evidence indicating Wilson had held the stick. The GBI agent explained that there was little to no chance of getting a fingerprint from the surface of the stick and any "touch DNA" that would have come from the stick would have been expected and would not be probative. Moreover, the scene was not very bloody, and the GBI agent did not remember seeing blood on the stick on the day of the shooting.

### C. Procedural History

---

[2] The deputies admit on appeal that they gave incorrect estimates of the size of the stick during their interviews with the GBI.

On August 31, 2017, the plaintiffs filed an amended complaint alleging claims under § 1983 and state law against Parker and claims under the ADA and the Rehabilitation Act against both Parker and Thompson.  The district court granted summary judgment on all claims.  First, the court concluded the § 1983 claim was barred by qualified immunity.  The court further determined the ADA claim failed because the plaintiffs did not (1) present evidence that Wilson was a qualified individual with a disability, (2) show that any modification of police procedures would have been reasonable, or (3) establish that any purported discrimination was by reason of Wilson's disability.  The court also concluded the defendants were entitled to summary judgment with respect to the Rehabilitation Act claim for these reasons and because there was no evidence that the Bartow County Sheriff—the defendants' employer—had received federal funds at the time of the underlying incident.  As to the state law claims, the court determined Parker was not entitled to official immunity, but the claims failed on the merits.  This appeal followed.

## II. DISCUSSION

"We review a district court's grant of summary judgment *de novo*, viewing all the evidence, and drawing all reasonable factual inferences, in favor of the nonmoving party."  *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir.

2017) (quoting *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1321 (11th Cir. 2014)).

## A. Excessive Force Claim

Apprehension by deadly force constitutes a seizure. *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013). In determining whether an officer used excessive force "we pay 'careful attention to the facts and circumstances' of the case, 'including the severity of the crime at issue . . . and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight,'" *id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989)), but the decisive fact here is the threat of physical harm that Wilson posed to Thompson at the time Parker shot him, *cf. Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010) ("In this case, the reasonableness analysis turns on the second of these factors: the presence of an imminent threat."). If a reasonable officer could have believed under the circumstances that Wilson "posed a threat of inflicting serious injury or death" to Thompson, then "the shooting was objectively reasonable regardless of whether [Wilson] had already committed a crime or was resisting or attempting to evade arrest." *Shaw v. City of Selma*, 884 F.3d 1093, 1099 n.5 (11th Cir. 2018). Nevertheless, "we must still slosh our way through the factbound morass of 'reasonableness,'" to answer that question. *Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 1778 (2007).

As an initial matter, Wilson's appearance and conduct made it apparent that something was wrong and that his behavior might be unpredictable and dangerous. It certainly would be strange to find an adult man in possession of all his faculties sitting alone in the woods in his underwear, screaming at nothing. This would have warned Parker and Thompson that Wilson was mentally ill, heavily intoxicated, or both.[3] Law enforcement officers approaching suspects in such circumstances should use special caution, both to protect themselves and the suspect.

While we sympathize with the plaintiffs for their loss, we conclude Parker did not violate Wilson's Fourth Amendment rights. First, Parker had probable cause to believe Wilson posed a threat of serious physical harm to Thompson. According to the deputies' testimony, Wilson charged at Thompson while holding a stick that was five and one-half feet long.[4] Although Wilson did not point the

---

[3] Thompson testified that he believed Wilson was intoxicated.

[4] The plaintiffs argue that a reasonable jury might discredit the deputies' testimony that Wilson had a stick. As support for this claim, they point to portions of an audio recording, inconsistencies in the deputies' accounts, and the fact that the state did not conduct tests for trace evidence on the stick. They further contend there is a credibility issue as to whether Wilson charged at Thompson. But "discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2514 (1986) (alteration omitted) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S. Ct. 1949, 1966 (1984)). Additionally, none of the evidence to which the plaintiffs point constitutes affirmative evidence in support of their theory. *See id.* ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."). Even setting aside the deputies' testimony, "the mere fact that the record, when viewed in the light most favorable to [the plaintiffs], is theoretically not inconsistent with [the plaintiffs' theory of events], is not enough to survive summary judgment."

stick at Thompson or raise it to swing it, "[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (alteration omitted) (quoting *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007)). Moreover, Wilson had not yet closed the distance between himself and Thompson, and he could have swung the stick at Thompson once he was within range. *See Shaw*, 884 F.3d at 1100 (holding that an officer did not use excessive force in shooting a suspect that was carrying a hatchet and approaching the officer because, even though the hatchet was not raised at the time of the shooting, the suspect "could have raised [it] in another second or two and struck [the officer] with it").

Wilson also had refused to comply with repeated commands to show his hands, which tips in favor of finding Parker's behavior objectively reasonable. *Cf. Penley*, 605 F.3d at 851 ("[The plaintiffs] do not contest that [the decedent] refused to comply with repeated commands to drop his weapon [a toy gun]. Non-compliance of this sort supports the conclusion that use of deadly force was reasonable."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1168 (11th Cir. 2009) ("[T]he escalation into deadly force was justified by [the decedent's] refusal to

---

*Hammett v. Paulding Cty.*, 875 F.3d 1036, 1050 (11th Cir. 2017). The plaintiffs' theory is "pure speculation." *Id.*

9

comply with the officers' commands."). The fact that Wilson had been acting erratically also weighs in Parker's favor, as a person acting unpredictably could present an increased threat to others. Finally, although Parker gave no warning that he would use deadly force, it was not feasible to do so under the circumstances because the situation unfolded rapidly; only about eleven seconds passed between Thompson's first order for Wilson to show his hands and Parker's first shot. Additionally, Wilson was advancing toward Thompson faster than Thompson could back up, so pausing to warn Wilson would have increased the risk that Thompson would be seriously harmed.

Parker was faced with a difficult choice. He could either shoot an apparently intoxicated or mentally ill man, or he could stand aside and risk a fellow officer being seriously harmed or killed. Even if the situation could have been handled better—a proposition that is by no means certain—"we are mindful that officers make split-second decisions in tough and tense situations," and "[w]e are 'loath to second-guess decisions made by police officers in the field.'" *Hammett v. Paulding Cty.*, 875 F.3d 1036, 1050-51 (11th Cir. 2017) (first quoting *Morton*, 707 F.3d at 1281; then quoting *Penley*, 605 F.3d at 854). Viewing the facts from the perspective of a reasonable officer on the scene, we conclude Parker did not violate Wilson's Fourth Amendment rights. Accordingly, Parker was entitled to summary judgment with respect to the excessive force claim.

**B. ADA and Rehabilitation Act Claims**

As to the ADA claim, the district court stated several reasons the defendants were entitled to summary judgment: (1) the plaintiffs had not shown Wilson was a qualified individual with a disability; (2) the plaintiffs had not established that it was reasonable for the deputies to modify police procedures; and (3) the plaintiffs had not shown that any alleged discrimination was by reason of Wilson's disability. The district court relied on all these grounds and an additional reason in granting summary judgment as to the Rehabilitation Act claim.

The only argument the plaintiffs advance on appeal with respect to their ADA and Rehabilitation Act claims is that the district court erred by holding an intoxicated, disabled person is not a qualified individual with a disability simply due to his intoxication.[5] Because they have not asserted any specific arguments with respect to the district court's alternative grounds for granting summary judgment on the ADA and Rehabilitation Act claims, the court's order as to these claims is due to be affirmed. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is

---

[5] In their reply brief, the plaintiffs further assert that reasonable jurors could find an intentional failure to reasonably accommodate Wilson's disability. But they failed to make this argument in their initial brief, and a reply brief is not the place to raise arguments for the first time. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682-83 (11th Cir. 2014). In any event, this argument does not specifically address the district court's reasons for granting summary judgment.

11

deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed.").

### C. State Law Claims

Finally, the plaintiffs urge us to reverse the district court's grant of summary judgment on their state law claims for excessive force, abuse of a person being arrested, battery, and negligence. Their sole argument on appeal is that Parker is not entitled to official immunity. But the district court did not determine that official immunity applied; indeed, it concluded the opposite—that Parker was not entitled to official immunity. Although the district court granted summary judgment in Parker's favor, it did so on the basis that the state law claims lacked merit. The plaintiffs have not advanced any arguments as to why their state law claims are meritorious. Therefore, they have abandoned any claim that the district court erred in concluding otherwise. *See id.*

### III. CONCLUSION

In sum, we conclude Parker did not violate Wilson's Fourth Amendment rights, and the plaintiffs have not shown that the district court erred with regard to their remaining claims. Accordingly, we affirm the district court's grant of summary judgment in favor of the defendants.

**AFFIRMED.**

12