[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10776

_____

D.C. Docket No. 0:16-cv-61595-MGC


DONNETT M. TAFFE,
Personal Representative of the Estate of
Steven Jerold Thompson, deceased,

                                        Plaintiff - Appellee,


versus

GERALD E. WENGERT,
in his individual capacity
SCOTT ISRAEL,
in his individual capacity
SCOTT ISRAEL,
in his official capacity,

                                        Defendants - Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(May 17, 2019)

Before WILSON, JILL PRYOR, and SUTTON,[*] Circuit Judges.

PER CURIAM:

Deputy Sheriff Gerald Wengert shot and killed Steven Jerold Thompson while out on a dispatch call regarding a suspected armed robbery. Thompson's sister and personal representative, Donnett Taffe, subsequently sued Wengert in his individual capacity, alleging that he violated Thompson's Fourth and Fourteenth Amendment rights by using excessive deadly force. Taffe also sued the former Broward County Sheriff, Scott Israel, in both his individual and official capacities for the negligent hiring, training, and supervision of Wengert. The district court, citing disputed issues of material fact about the shooting, denied qualified immunity to both Wengert and Israel and denied their motion for summary judgment on all claims. Wengert, Israel, and the Sheriff's Office appeal that ruling.

After careful review and with the benefit of oral argument, we conclude that Taffe failed to establish a genuine dispute of material fact that would preclude summary judgment. Accordingly, we are compelled to reverse the district court's denial of summary judgment on all claims.

---

[*] Honorable Jeffrey S. Sutton, United States Circuit Judge for the Sixth Circuit, sitting by designation.

## I. Background

A. Facts

"In exercising our interlocutory review jurisdiction in qualified immunity cases, we are not required to make our own determination of the facts for summary judgment purposes; we have discretion to accept the district court's findings, if they are adequate.  But we are not required to accept them."  *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996) (internal citations omitted).  Because the district court's findings were not adequate, we undertake our own review of the record.

In June 2014, two women called the police to report that two men had robbed them of their belongings and cellphones at gunpoint.  Deputies from the Broward Sheriff's Office, including Deputy Wengert, were dispatched to investigate.  The callers described the robbers as two black males with low-cut hair and dark clothing.  One suspect was 5'10" with a thin build and had a black semiautomatic weapon.  The other suspect was 5'8" with a heavy-set build.  At least one suspect wore "bright sneakers."  A deputy asked dispatch if the victims noticed whether the suspects had any distinguishing characteristics.  Dispatch responded, "[The victims are] advising no.  She's saying they could have had it but she was just too sidetracked looking at the weapon."

3

Using a GPS application, deputies quickly tracked one of the stolen cellphones to Cypress Grove Apartments. Officers from the Lauderhill Police Department joined the search. Law enforcement tracked the stolen phone to the parking lot at the southern end of the apartment complex. When the deputies neared the parking lot, they encountered Thompson and a group of other men.

Thompson was a 26-year-old black male. He was approximately 5'8" and weighed 210 pounds. That evening, Thompson was wearing primarily black clothing, although his shorts also had a white and orange pattern. His sneakers were black and orange, and he was wearing a hat with white lettering. Thompson was close to the stolen phone, based on the GPS data. When the officers reached the parking lot, Thompson quickly turned around and reentered the apartment building. Officers demanded Thompson stop, but Thompson did not respond. Deputies Wengert and Clark chased after Thompson into the building.

Deputy Wengert later described what happened inside. He testified that after entering the apartment hallway, Wengert saw Thompson in front of him with a firearm pointed in Wengert's direction. Thompson fired what Wengert believed to be two shots, which missed Wengert. Thompson kept running down the hallway, keeping his firearm pointed behind him towards Wengert. Wengert fired and hit Thompson. Wengert told Thompson to drop his gun and continued to fire when Thompson did not comply. Wengert stopped firing when he saw that

4

Thompson had dropped the gun and it was a safe distance away from him. An audio recording of the shooting is consistent with this testimony. The audio captures a distinct series of events: one or two shots, a call over the radio of "shots fired," someone—presumably Wengert—shouting "put the gun down," and then a barrage of gunfire. Wengert ultimately fired 25 rounds. Eight hit Thompson from behind. A ninth hit him while he was on the ground.

By the time the gunfire ceased, multiple law enforcement officers had converged upon the hallway. Officer Weeks from the Lauderhill Police Department—an agency wholly separate from the Broward Sheriff's Office—was first to arrive at the scene. Officer Weeks testified that almost immediately after the shooting, he peered into the hallway, where he saw a gun next to Thompson. At the time Officer Weeks saw the gun next to Thompson, Wengert was still behind a wall in his position of cover, and no other deputy or officer had entered the hallway.

Deputy Yoder of the Broward Sheriff's Office testified that he arrived at the scene twenty to thirty seconds after the gunfire ceased. Deputy Yoder testified that he approached Thompson, who was still alive and cursing at the officers. Deputy Yoder testified that as he approached, he saw a gun next to Thompson. Deputy Yoder then testified that he kicked the gun down the hallway and away from

5

Thompson to ensure that he could not reach it.[1]  Deputy Yoder estimated that the gun slid twenty to twenty-five feet down the hallway.

Officers then handcuffed Thompson and called EMS.  After the shooting, Wengert moved his car to the side of the building where the incident occurred.  He eventually went back into the building.  EMS transported Thompson to a local hospital, but he died that night from his injuries.

After the shooting, investigators recovered a gun—a Diamondback Luger— from the apartment hallway.  A final investigative report placed the gun 51 feet from where Thompson's body had come to rest.  Investigators also recovered a casing from the Diamondback Luger.  The gun tested positive for Thompson's DNA.

B. Procedural History

Thompson's personal representative, Donnett Taffe, sued the defendants in Florida state court.  The defendants removed the case to federal court.  Taffe filed an Amended Complaint with five claims:

- **Count I:** State law assault and battery claim against Wengert for unlawfully shooting Thompson;
- **Count II:** Claim under 42 U.S.C. § 1983 against Wengert, in his individual capacity, for unlawfully shooting Thompson (asserting Fourth and Fourteenth Amendment claims for using excessive force);

---

[1] We acknowledge, as Taffe points out, that on the night of the shooting, Deputy Yoder stated that the deputies did not touch the weapon.  After reading Deputy Yoder's later deposition, we understand that statement to mean the deputies did not touch the weapon or remove it from the hallway after Yoder had kicked the weapon to put it out of Thompson's reach.

6

- **Count III:** State law tort claim against Israel, in his official capacity, for negligent hiring, supervision, and retention, resulting in Thompson's wrongful death;
- **Count IV:** Claim under 42 U.S.C. § 1983 and state tort law against Israel, in his individual capacity, for negligent hiring, supervision, and retention, resulting in Thompson's wrongful death; and
- **Count V:** Claim under 42 U.S.C. § 1983 against Israel, in his official capacity, for negligent hiring, supervision, and retention, resulting in Thompson's wrongful death

The defendants sought summary judgment on all counts, and both Wengert and Israel argued that they were entitled to qualified immunity on the claims against them in their individual capacities.

As the district court recognized, the parties dispute what happened that night. Taffe alleges that Thompson had nothing to do with the robbery, did not fit the robbery suspects' descriptions, was not armed, and did not shoot at Wengert. Taffe also alleges that Wengert planted the gun recovered at the scene. The defendants maintain, however, that Thompson *did* meet the description of the robbery suspect, *was* armed, and *did* fire the first shot at Wengert, who returned fire until the threat was subdued. The officers firmly dispute that any gun was planted at the scene. The district court, finding these stories incompatible, concluded that disputed issues of material fact remained. The district court denied

7

qualified immunity to both Wengert and Israel and denied the Defendants' joint motion for summary judgment on all claims.  All Defendants appealed.[2]

## II. Standard of Review

We review a district court's denial of summary judgment on qualified immunity grounds de novo.  *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003).  Generally, "[w]e resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts."  *Id.*  But "facts must be viewed in the light most favorable to the nonmoving party only if there is a *'genuine'* dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added) (quoting Fed. R. Civ. P. 56(c)); *see also Penley v. Eslinger*, 605 F.3d 843, 853 (11th Cir. 2010) ("Though factual inferences are made in [Plaintiff's] favor, this rule applies only *to the extent supportable by the record*.").  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380.  And "[w]here the record taken as a whole could not lead a

---

[2] On appeal, we asked the parties whether we have pendent appellate jurisdiction to review the district court's denial of summary judgment on the claims against the Sheriff's Office.  Because those claims are "inextricably intertwined" with the denial of qualified immunity, we exercise pendent appellate jurisdiction over those claims.  *See King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1379 (11th Cir. 2009).

rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal quotation omitted).

### III. Discussion

#### A. Qualified Immunity

Qualified immunity shields government officials sued in their individual capacities from liability when they act within their discretionary authority and when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation omitted).

To invoke qualified immunity, an official must first demonstrate that he was acting within the scope of his discretionary authority. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). The burden then shifts to the plaintiff to establish both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct. *Id.* We may decide these issues in either order, but to survive a qualified immunity defense, the plaintiff must satisfy both. *Id.* at 1120−21. "If the conduct did not

9

violate a constitutional right, the inquiry ends there." *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005).

### B. Section 1983 Claim Against Wengert

Because there is no doubt that Wengert was acting within his discretionary authority the night of the shooting, the burden shifts to Taffe to show, at a minimum, that Wengert's conduct violated a constitutionally protected right. *Maddox*, 727 F.3d at 1120.

Taffe first argues that Wengert did not have probable cause to arrest Thompson. "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation omitted). Probable cause depends on the totality of the circumstances and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). Arresting officers are also entitled to qualified immunity if the officer had arguable probable cause for the arrest. *See Ferraro*, 284 F.3d at 1195. "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[ ] could have believed that probable cause existed to arrest." *Id*. (internal quotation omitted). At

10

this stage, in determining whether Wengert had probable cause or arguable probable cause to arrest Thompson, we view the facts—to the extent supported by the record—in the light most favorable to Taffe. *See Penley*, 605 F.3d at 853.

After reviewing the record, we find that Wengert had at least arguable probable cause to arrest Thompson. The totality of the circumstances would have led the officers to believe that Thompson matched the description of the robbery suspect. Dispatch reported that one of the robbery suspects was a black male who was 5'8" with a heavy-set build. The suspects were wearing dark clothing and one had bright sneakers. When the officers tracked the stolen cell phone to the Cypress Grove Apartments, they encountered Thompson. Thompson was a black male who was approximately 5'8" and weighed 210 pounds. He was wearing primarily dark clothing and had black and orange sneakers. Thompson was very close to the GPS location of the stolen phone. Under the totality of the circumstances, Thompson was thus a plausible match, and perhaps even a strong match, for the robbery suspect.[3] A reasonable officer in the same circumstances as Wengert would have believed he had probable cause to arrest Thompson.

---

[3] Taffe argues that officers should have known that Thompson did not match the robbery suspect because Thompson had distinguishing characteristics—such as gold teeth and scars—and the officers were affirmatively told that the suspects did not have such characteristics. The dispatch audio, however, states that the victims could not provide distinguishing characteristics for the suspects. The officers did not have affirmative knowledge that suspects should *lack* distinguishing characteristics, and thus there was no reason for them to conclude that Thompson did not match the description of the robbery suspect.

Taffe next argues that Wengert violated Thompson's constitutional rights by using excessive deadly force against him.  Apprehending a suspect through the use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement.  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  An officer may use deadly force against a person he reasonably perceives as posing an imminent threat of serious physical harm to an officer or others.  *Arrugueta*, 415 F.3d at 1256; *see also Hammett v. Paulding Cty.*, 875 F.3d 1036, 1048 (11th Cir. 2017) (explaining that an officer may use deadly force when he reasonably believes that his own life is in peril).

Taffe alleges that Thompson was unarmed on the night of the shooting and thus could not fire the first shot.  Taffe further asserts that Wengert (or other deputies) planted a gun at the scene after the shooting.[4]  If true, Wengert would not be entitled to qualified immunity or summary judgment on Taffe's excessive force claim.  But to preclude summary judgment, Taffe cannot rely on "mere allegations" in her pleadings, and instead must put forward evidence that creates a *genuine* dispute of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Taffe has not met this burden.

---

[4] Taffe's Amended Brief implied that Wengert himself planted the gun near Thompson's body. At oral argument, Taffe's counsel maintained that Deputies Koutsofios and Yoder planted the gun, and that Wengert planted the casing.

12

Taffe argues that, contrary to Wengert's testimony, Thompson was not armed that night. In support, she offers deposition testimony from Imani Key, a friend of Thompson, who testified that someone named Nate told her that he did not see Thompson with a gun. Nate did not testify. Taffe also offers deposition testimony from Rodney Moss, another friend of Thompson, as definitive proof that Thompson did not have a gun. Moss testified that earlier on the day of the shooting, he did not see Thompson with a gun. Moss also stated, however, "[a]nything after that, I wasn't there so I wouldn't know."

Key's testimony is inadmissible hearsay. We "may consider a hearsay statement in passing on a motion for summary judgment [only] if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293−94 (11th Cir. 2012) (internal quotation omitted). Taffe fails to explain how Key's testimony could be reduced to admissible evidence at trial, and we therefore decline to consider it. Additionally, Moss's testimony indicates only that Thompson was unarmed earlier that day. Taffe therefore has not put forward any admissible testimony—credible or not—that Thompson was not armed on the evening of the incident.

Taffe also argues, contrary to Wengert's testimony, that Thompson did not fire the first shot. In support, she offers testimony from some apartment residents who do not remember hearing a single defining shot, only a general barrage of

13

gunfire.  Officer Weeks also testified that he only remembered hearing general gunfire.  In addition, no apartment resident testified that they remembered hearing Wengert telling Thompson to drop a gun.  Wengert, on the other hand, presented testimony from officers and an apartment resident who remember hearing a defining shot before the rest of the gunfire broke out.

Presented alone, these conflicting accounts would likely be sufficient to establish a genuine dispute that Thompson did not fire at Wengert.  But the audio of the shooting resolves these conflicting accounts.  The audio captures one or two initial shots, a call over the radio of "shots fired," someone—presumably Wengert—shouting "put the gun down," and *then* a barrage of gunfire.

Taffe finally alleges that Wengert planted a gun at the scene after the shooting.  Wengert testified that after the shooting, he left the hallway and moved his car around to the side of building where the incident occurred.  Taffe strongly implies that when Wengert did so, he obtained a new gun and casing, swiped the gun onto Thompson's hand to pick up Thompson's DNA, and dropped the gun in the hallway.[5]  Taffe argues that Wengert had time to execute this plan because the deputies staged EMS outside and prevented EMS from treating Thompson until Wengert could finish planting the gun.  Moreover, Taffe argues that the other

---

[5] At oral argument, however, Taffe's counsel maintained that Deputies Koutsofios and Yoder planted the gun, and that Wengert planted the casing.

14

officers never saw the gun near Thompson, and instead the officers only saw the gun "in the middle of the hallway."[6]

After careful review, we find that the record evidence contradicts Taffe's version of events. Every law enforcement officer who had an opportunity to see the scene testified that they saw the gun next to or relatively near Thompson immediately after the shooting.[7] Moreover, there is no evidence that deputies prevented EMS from treating Thompson to give themselves time to plant a gun. EMS records show that fire rescue made their way towards Thompson approximately one minute after arriving on the scene. They began treating Thompson's injuries another minute later.

In their depositions, the law enforcement officers—including those unaffiliated with the Broward Sheriff's Office—explicitly refuted the allegation that anyone planted a gun at the scene. Officer Weeks, who had never met Wengert before that night, testified that if someone had planted a gun, he would have considered such behavior to be a crime and he would have reported it.

---

[6] Contrary to Taffe's characterization, Officer Michel testified that immediately after the shooting, he saw the gun "a couple of feet away" from Thompson. Officer Michel also stated that the gun was "in the middle of the hallway," but this is consistent with the gun being close to Thompson, as Thompson was shot and went down in the middle of the hallway.

[7] We acknowledge Taffe's argument that the officers' testimony about the placement of the gun immediately after the shooting is not perfectly consistent. For example, one remembers the gun a "couple feet away from Thompson," another about 10 feet, and another 15–20 feet. We find this discrepancy insufficient to preclude summary judgment in the face of all other evidence.

Ultimately, the allegation that Wengert or another deputy planted a gun in the hallway, is, at best, speculation. And "[a]lthough all reasonable inferences are to be drawn in favor of the nonmoving party, an inference based on speculation and conjecture is not reasonable." *Hammett*, 875 F.3d at 1049 (internal quotation omitted).

To preclude summary judgment, Taffe must go beyond the allegations in her pleadings and put forward evidence that creates a genuine dispute of material fact. *Liberty Lobby*, 477 U.S. at 248. But "[a] genuine dispute requires more than some metaphysical doubt as to the material facts." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (per curiam) (internal quotation omitted). Instead, a genuine dispute arises when "the evidence is such that a reasonable jury could find for the nonmovant." *Hammett*, 875 F.3d at 1049. Here, no reasonable jury could accept Taffe's version of events based on the evidence in the record.[8] The district court's denial of qualified immunity relied largely on Taffe's allegations, not the evidence in the record. The evidence instead supports Wengert's version of the facts: Thompson was armed, fired the first shot, and only then did Wengert return fire.

---

[8] This does not mean that a reasonable jury could never conclude that an officer planted a gun to cover up the shooting of an unarmed citizen. But a reasonable jury could not accept Taffe's theory because the record evidence does not support Taffe's version of events.

Officers may use deadly force against individuals they reasonably perceive pose an imminent threat of serious physical harm to the officers or others. *Arrugueta*, 415 F.3d at 1256. Under that standard, Wengert did not use excessive force. Wengert is thus entitled to qualified immunity and summary judgment on this claim.

### C. State Law Assault and Battery Claim

Taffe also sued Wengert under Florida law for assault and battery. The district court denied summary judgment on this claim.

"Pursuant to Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is 'clearly excessive.'" *Davis v. Williams*, 451 F.3d 759, 768 (11th Cir. 2006) (quoting *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)). An officer in Florida is also entitled to use deadly force when "he or she reasonably believes [such force] to be necessary to defend himself or herself or another from bodily harm while making the arrest." Fla. Stat. § 776.05(1). Because we have already concluded that Wengert's force was objectively reasonable under the circumstances, we reverse the district court and grant summary judgment to Wengert on this claim.

### D. State Law Negligent Hiring and Retention Claim

17

Taffe sued Sheriff Israel under Florida state tort law for the negligent hiring, supervision, and retention of Wengert, resulting in Thompson's wrongful death. The district court denied summary judgment on this claim.

To succeed on a negligent hiring or retention claim, the plaintiff must demonstrate, among other things, that the employee committed an underlying willful tort. *See, e.g.*, *Magill v. Bartlett Towing, Inc.*, 35 So. 3d 1017, 1020 (Fla. 5th DCA 2010). Because Taffe has not done so, these claims cannot succeed as a matter of law. Accordingly, we reverse the district court and grant summary judgment to Sheriff Israel on this claim.

### E. Supervisory Liability and Municipal Liability Claims

Finally, Taffe sued Sheriff Israel in both his individual and official capacities for the negligent hiring, supervision, and retention of Wengert, resulting in Thompson's wrongful death. The district court denied summary judgment on both claims.

"Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). And "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a

18

custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

Because Taffe has not established that Thompson's constitutional rights were violated, neither the supervisory liability claim nor the municipal liability claim can succeed as a matter of law. We thus reverse the district court and grant summary judgment to Sheriff Israel and the Sheriff's Office on both claims.

## IV. Conclusion

Thompson's death was undoubtedly tragic. But no reasonable jury could accept Taffe's theory based on the record evidence. Allowing such a case to proceed to trial would "stretch the summary judgment standard far beyond its breaking point." *Hammett*, 875 F.3d at 1048.

Accordingly, we reverse the judgment of the district court and grant qualified immunity and summary judgment to Deputy Wengert, Sheriff Israel, and the Sheriff's Office on all claims.

**REVERSED.**