[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11140

_____

D.C. Docket No. 3:17-cv-00038-TCB

JANE DOE,

Plaintiff-Appellant,

versus

INVESTIGATOR CHERYL SMITH,
individually,
CAPTAIN TERESA PILCHER,
individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 15, 2020)

Before WILLIAM PRYOR, JILL PRYOR, and LUCK, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

This appeal involves a tragic case of three young girls who were molested by their uncle and juvenile cousin while their mother, Jane Doe, was on vacation on a cruise ship. After Doe returned from vacation, her daughters informed her of the abuse, and she alerted the state authorities. During an investigation, Deputy Cheryl Smith learned that the juvenile cousin, R.L., inappropriately touched all three girls previously and that Doe knew of this prior abuse. Deputy Smith also learned that, although Doe knew of the past incidents, she continued to allow her daughters to play with R.L. Indeed, Deputy Smith uncovered evidence suggesting that Doe permitted her daughters to spend the night at R.L.'s home while she was on vacation. Based on her investigation, Deputy Smith obtained arrest warrants for Doe for second-degree cruelty to children, Ga. Code Ann. § 16-5-70(c), for permitting her daughters to stay with their previous molester while she was on vacation. Eventually, the state court dismissed the charges against Doe for lack of prosecution. Doe then sued Deputy Smith for malicious prosecution under federal and state law. The district court granted summary judgment in favor of Deputy Smith based on qualified immunity and official immunity. We affirm.

## I. BACKGROUND

Ordinarily, we do not refuse to identify parties to a suit, especially the parties who chose to initiate the suit in the first place. But the four young girls at the center of this case did not ask for the horrible events of their lives to be

unfurled before the public. For that reason, we address each of the children involved by their initials, their mother by the pseudonym Jane Doe, and any other adult family members by their first names. With that in mind, we first explain the relevant individuals before proceeding to explain the series of events that gave rise to this suit.

Jane Doe is the mother of three daughters: B.D., R.D., and A.D. At the time of these events, Doe and her daughters lived with Doe's father and brother. Doe's sister and her sister's former spouse, Jimmy, had three children, including a daughter named R.L., but those children have lived with Doe's mother, Donna, since 2010.

Donna obtained custody of R.L. and her brothers after Jimmy and his wife neglected them. Jimmy had no contact with his children for years, but a few months before these events, he began living with Donna and his children. Donna also provided childcare for Doe, a single mom working full time to support her daughters. This arrangement meant that Doe's daughters often played with R.L.

In 2013, Doe learned from her daughters that R.L., then age six, touched R.D., then age four, in her "No-No spot." R.D. said that she tried to stop R.L but R.L. "held her down." B.D., then age seven, also said that R.L. tried to do the same to her on a few occasions, but that she was able to stop R.L. Doe reported the allegations to the children's teacher and a school counselor. The school counselor

3

referred the allegations to the Georgia Division of Family and Children Services. The Division apparently investigated but took no action.

R.L. began to receive counseling from the school guidance counselor following the 2013 incident. In 2014, R.L. also started therapy with another "school-based therapist" who had a specialty in "sex therapy." Donna says she told Doe that R.L. was in counseling with both professionals, neither of whom told her that R.L. could not be around other children. So Doe continued to allow her daughters to play with R.L, although she says that she imposed a rule that they could play together only while supervised.

A year later, Doe's daughters told their paternal grandmother that the son of a family friend inappropriately touched them. When the paternal grandmother told Doe "about the situation, [Doe] stated that she did not want to get any agencies involved and stated that the situation was just 'kids being kids.'" So, the paternal grandmother reported the allegations to the state authorities herself.

A forensic investigator with the Carroll County Child Advocacy Center interviewed B.D. and R.D. about the allegations. During the interview, both girls also disclosed that R.L. had inappropriately touched them. B.D. explained that R.L. had pulled B.D. and her two sisters into a closet, forced them to take off their clothes, and then performed oral sex on them. R.D. similarly disclosed that R.L. performed oral sex on her and also forced her to reciprocate. After the interviews,

4

the forensic investigator says she told Doe about her daughters' allegations and stressed that Doe should not leave her daughters unsupervised with R.L. Doe says she knew something inappropriate happened but was unaware of the specifics. She agrees that the forensic investigator stressed the need for supervision. Ultimately, law enforcement and the Division "screened out" the report because the conduct involved "child on child behaviors" and the "children [did] not reside in the same household." Following the 2014 reports, Doe again allowed her daughters to play with R.L. under supervision at Donna's home.

In February 2015, Doe and her boyfriend left for a five-day cruise with Donna and her husband. Doe says she left her three daughters under her father and brother's care at her house, and Donna left the three cousins under their father Jimmy's care at her house.

While on the cruise, Doe gave permission for her daughters to play with their cousins at Donna's house under Jimmy's supervision. Although Doe says she did not give permission for her daughters to sleep over at Donna's house, all six children ended up staying there for three or four nights with Jimmy as the only adult supervisor.

While Doe's daughters stayed at Donna's home, each of them was sexually abused. Jimmy exposed his genitals to B.D. and molested A.D. And R.L. molested R.D. When these molestations occurred, B.D. was age 9, R.L. was age 8, R.D. was

5

age 7, and A.D. was age 6. About one week after she returned from her cruise, Doe learned of the abuse from her daughters.

After communications between Doe, the school counselor, the forensic investigator, the Division, and the sheriff's office, Deputy Smith began her investigation. During her investigation, Deputy Smith collected various documents, interviewed several people, and observed the forensic interviews of Doe's daughters and R.L.

One document Deputy Smith collected was the intake report that the Division created after the school counselor referred the latest allegations to it. The intake report expressed "concern[] about [the] parental ability of mom to protect the children due to this [being] the second time this has happened. There is concerns about who is supervising the children . . . . This is the second time this has happened and mom is still allowing the children to go back to this house." The report said "[i]mpending dangers have been identified . . . . The family needs intervention to ensure that the mother follows through with consulting law enforcement and has protective measures in place."

Deputy Smith also collected copies of two documents the Division created after speaking with Doe and her daughters about the new allegations, including a safety plan and a comment log. The safety plan required Doe's children to be supervised at all times and to not have any connection with persons living at

Donna's home during the investigation. A Division investigator's comment log described her discussions with Doe and Doe's daughters about the allegations. According to the Division investigator, A.D. said that R.L. "will do nasty things to her and Uncle Jimmy will touch her in the wrong place." The Division investigator also noted that Doe "gave approval for the girls to go over to [Donna's] house."

When Deputy Smith interviewed Doe, they discussed the previous allegations and Deputy Smith repeatedly asked Doe why she allowed her daughters to continue to play with R.L. despite R.L.'s history. Doe replied that R.L. was in therapy, that the family had a rule that the children were to be supervised, that no professional had told her the children could not play together, and that she frequently spoke with her daughters about molestation to keep tabs on the situation. Doe also told Deputy Smith that her daughters were to be at her house while on vacation, not at Donna's house. When Deputy Smith asked Doe about Jimmy's background, Doe admitted that Jimmy and her sister lost custody several years beforehand because they neglected their children, and that Jimmy had only recently returned to their lives.

Deputy Smith also interviewed Donna, who acknowledged the previous inappropriate touching by R.L. and explained that she had reported the touching to the school, police, and Division. Donna also admitted to having caught R.L. inappropriately touching her brother once. Donna said that R.L. had been receiving

7

counseling.

Deputy Smith also spoke to the paternal grandmother of Doe's daughters and the forensic investigator. Both the paternal grandmother and the forensic investigator relayed to Deputy Smith what occurred in 2014. And Deputy Smith obtained copies of various documents describing both the 2013 and the 2014 allegations.

Deputy Smith then observed the forensic investigator's interviews of Doe's daughters and R.L. about the new allegations. R.D. reported having been abused by R.L. every time she visited Donna's house. A.D. and B.D. did not say R.L. did anything to them during the sleepover, but both girls reported Jimmy's sexual abuse that weekend. B.D. also described molestation by R.L. two years earlier. When the forensic investigator interviewed her, R.L. said that Doe permitted Doe's daughters to sleep over during the cruise.

Sometime after these interviews, Deputy Smith told the forensic investigator that she was considering charging Doe as well as Jimmy. The forensic investigator "supported" Deputy Smith's inclination to charge Doe. The forensic investigator believed Doe "had been negligent as a parent . . . and had knowingly and willingly put her children back in harm's way."

Deputy Smith applied for arrest warrants for both Jimmy and Doe. In her warrant affidavits, Deputy Smith requested warrants to arrest Doe on three counts

8

of cruelty to children in the second degree and alleged that Doe "with criminal negligence cause[d] [her children] . . . cruel or excessive physical or mental pain by leaving th[e]se child[ren] for several days and nights in the residence with a previous offender so that [Doe] could go on a cruise . . . ." Deputy Smith says she orally "highlighted [to the magistrate judge] the facts of the case" and identified the "previous offender" as the child R.L.

The magistrate judge issued three arrest warrants for Doe for second-degree cruelty to children under Georgia law—one for each daughter. *See* Ga. Code Ann. § 16-5-70(c). A person commits this offense "when such person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." *Id.* Georgia defines "criminal negligence" as "an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." *Id.* § 16-2-1(b); *see also Scott v. State*, 834 S.E.2d 88, 92 (Ga. 2019) ("[C]riminal negligence is the reckless disregard of consequences, or a heedless indifference to the rights and safety of others, and a reasonable foresight that injury would probably result." (internal quotation marks omitted)).

The same magistrate judge also issued warrants to arrest Jimmy for child molestation. Ga. Code Ann. § 16-6-4. Jimmy stated in his post-arrest interview that Doe's father, mother, and stepfather had approved the children staying with him,

9

so he assumed Doe had given permission too.

Although a grand jury indicted Doe on three counts of cruelty to children, the court later dismissed her criminal case because the state failed to comply with a speedy trial demand. Because of these events, Doe lost primary custody of her children.

Doe filed a complaint, 42 U.S.C. § 1983, against Deputy Smith and alleged a claim of malicious prosecution in violation of the Fourth Amendment. She also alleged that Deputy Smith maliciously prosecuted her in violation of Georgia law. The district court granted summary judgment in favor of Deputy Smith on the basis of qualified immunity and official immunity.

## II. STANDARD OF REVIEW

We review *de novo* a summary judgment based on qualified immunity or official immunity. *See Black v. Wigington*, 811 F.3d 1259, 1265 (11th Cir. 2016). Because Deputy Smith "raised [these] defenses in a motion for summary judgment, [she] should prevail if there is 'no genuine dispute as to any material fact' and [she is] entitled to [each] immunity 'as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "In making this determination, we view the evidence in the light most favorable to [Doe] and draw all reasonable inferences in [Doe's] favor." *Id.*

## III. DISCUSSION

Doe alleges that Deputy Smith is liable for malicious prosecution under both

10

federal and state law, and Deputy Smith responds that she is entitled to qualified immunity and official immunity. We agree with Deputy Smith.

### A. Deputy Smith Is Entitled to Qualified Immunity.

A plaintiff asserting a federal claim for malicious prosecution must prove both the common-law elements of malicious prosecution and a violation of the right to be free from unreasonable seizures under the Fourth Amendment. *See Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019). The common-law elements of malicious prosecution require Doe to prove that (1) Deputy Smith instituted or continued a criminal prosecution, (2) "with malice and without probable cause," (3) that terminated in Doe's favor and (4) caused her damage. *Id.* A police officer violates a person's right under the Fourth Amendment to be free from unreasonable seizures if she "applies for an arrest warrant" and "should have known that [her] application failed to establish probable cause." *Black*, 811 F.3d at 1267 (internal quotation marks omitted); *see also id.* (explaining that a malicious prosecution claim "requires a seizure pursuant to legal process," which "includes an arrest warrant" (internal quotation marks omitted)). Probable cause exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Paez*, 915 F.3d at 1285 (internal quotation marks

11

omitted).

The Fourth Amendment prohibits officers from making "statements or omissions in [a warrant] application that [are] material and perjurious or recklessly false." *Black*, 811 F.3d at 1267 (internal quotations marks omitted); *see also Paez*, 915 F.3d at 1287 ("Intentional or reckless material misstatements or omissions in a warrant affidavit thus could violate the Fourth Amendment. Negligent misstatements or omissions, on the other hand, do not." (citation omitted)). But a misstatement or omission does not violate the Fourth Amendment unless it is "material." *Paez*, 915 F.3d at 1287. That is, a violation occurs only if "probable cause would be negated [once] the offending statement [is] removed or the omitted information included." *Id.*

State actors sued under section 1983 enjoy the protections of qualified immunity. When an officer acts "within the scope of her discretionary authority at the time of the alleged misconduct," the officer can be held liable only if the plaintiff establishes that the officer "violated a federal statutory or constitutional right" and "the unlawfulness of [the officer's] conduct was clearly established at the time." *Id.* at 1284 (internal quotation marks omitted). Although a police officer who arrests a person without probable cause or who recklessly makes a material misrepresentation or omission in an application for a warrant violates the Fourth Amendment, the police officer does not lose the protection of qualified immunity if

12

the unlawfulness of her action was not clearly established. *See Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009). That is, qualified immunity shields a police officer from suit if "arguable probable cause existed" for the arrest. *Id.*; *see also Paez*, 915 F.3d at 1288 ("[I]f the affidavits (including the omitted information) would have demonstrated even arguable probable cause . . . then the officers are entitled to qualified immunity.").

"Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) (internal quotation marks omitted). "[I]nevitab[ly,]" an officer "will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." *Id.* (internal quotation marks omitted). Although "arguable probable cause depends on the elements of the alleged crime and the operative fact pattern," it does not "require proving every element of a crime." *Id.*; *accord Scarbrough v. Myles*, 245 F.3d 1299, 1302–03 (11th Cir. 2001). Doe does not contest that Deputy Smith acted in the scope of her discretionary duties when arresting her.

Doe argues that Deputy Smith should be denied qualified immunity for two reasons. First, she argues that Deputy Smith made material misstatements and

13

omissions when applying for the arrest warrants that vitiated probable cause. And even if Deputy Smith made no material misstatement or omission, Doe contends that Deputy Smith still lacked probable cause to arrest her. We address each argument in turn.

      1.  Deputy Smith Made No Material Misrepresentations or Omissions.

Doe argues that Deputy Smith misrepresented or withheld five pieces of information, any one of which she contends would have vitiated probable cause. Doe argues that Deputy Smith (1) misrepresented to the magistrate judge that Jimmy was a previous offender; (2) misrepresented to the magistrate judge that Doe left her daughters with a previous offender; (3) omitted that Doe followed professional guidance; (4) misrepresented that Jimmy was not "adequate supervision"; and, (5) misrepresented that Doe caused two of her children harm. For purposes of qualified immunity, if Deputy Smith made an intentional or reckless misrepresentation or omission, we need only decide whether arguable probable cause would have existed without any misrepresentation or with any omission. *See Paez*, 915 F.3d at 1288.

Doe argues that Deputy Smith misrepresented that Jimmy was the previous offender, but Deputy Smith's uncontradicted testimony states that she told the magistrate judge that the previous offender mentioned in the warrant affidavits was R.L., a minor child. Doe argues that a jury could infer that Deputy Smith lied

14

because Deputy Smith misrepresented Jimmy's offender status to the prosecutor, the Sherriff, the Division investigator, and the forensic investigator. But even if we assume that at some point Deputy Smith told these other officials that Jimmy had a previous record when he did not—an assumption the record does not support as to all of them—we cannot infer that she also told the magistrate judge that Jimmy was the previous offender. *See Hammett v. Paulding Cty.*, 875 F.3d 1036, 1049 (11th Cir. 2017) ("[A]n inference based on speculation and conjecture is not reasonable." (internal quotation marks omitted)); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 n.25 (11th Cir. 2011) ("[A]n inference[] is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." (internal quotation marks omitted)).

Doe argues that telling the magistrate judge that R.L. was the previous offender would be "recklessly misleading" because R.L. was too young under Georgia law to be held criminally responsible. *See* Ga. Code Ann. § 16-3-1. *But see Adams v. State*, 707 S.E.2d 359, 362 (Ga. 2011) (explaining that section 16-3-1 does not imply that children are "*incapable* of performing a[ criminal] act," does not "provide[] immunity from criminal prosecution," and "sets forth [only] an affirmative defense" (internal quotation marks omitted)). Deputy Smith testified that she provided an overview of the facts to the magistrate judge when seeking the warrants and that she told the magistrate judge that "the previous offender [she

15

was] referencing was a child" and "explained to the judge what the children relayed or revealed in their forensic interview[s]." And it is undisputed that R.L. previously molested her cousins. That R.L. was never charged does not change the risk she presented to her cousins. A reasonable officer could believe that Doe was criminally negligent for leaving her children with their previous molester. *See* Ga. Code Ann. §§ 16-2-1(b), 16-5-70(c).

Doe next argues that Deputy "Smith misrepresented the facts about the physical location where Doe left her children." In the warrant affidavit, Deputy Smith said that Doe committed cruelty to children in the second degree by "leaving [these children] for several days and nights in the residence with a previous offender." Doe asserts that she did not leave her daughters at Donna's house where R.L. lived and did not permit a sleepover. But Deputy Smith was not obliged to credit Doe's version of events.

The record is undisputed that Doe permitted at least a short visit during this period and that Deputy Smith had evidence that Doe also permitted the sleepover. Neither Deputy Smith nor the magistrate judge were required to credit Doe, her father, and her brother over other evidence that Doe allowed her daughters to stay overnight with R.L. at Donna's home. *See Paez*, 915 F.3d at 1286. Deputy Smith did not make an intentional or reckless misrepresentation based on the evidence she had before her. *Id.*; *see also Franks v. Delaware*, 438 U.S. 154, 165 (1978)

16

("[T]ruthful" "does not mean . . . that every fact recited in the warrant affidavit is necessarily correct [but] . . . that the information put forth is believed or appropriately accepted by the affiant as true.").

Next, Doe argues that Deputy Smith omitted from the warrant application that Doe complied with professional guidance. But, even assuming that Deputy Smith omitted that information "intentionally or with a reckless disregard for the accuracy of the affidavit," inclusion of the information would not have defeated arguable probable cause. *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997) (internal quotation marks omitted); *id.* ("[I]ntentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause."). No law establishes that following professional guidance definitively vitiates the elements of second-degree child cruelty, Ga. Code Ann. § 16-5-70(c). "[A] reasonable officer could have believed" that Doe committed second-degree child cruelty despite that she allegedly acted in accordance with professional guidance. *Paez*, 915 F.3d at 1288 (emphasis omitted). Moreover, a reasonable officer could also have concluded that Doe did not heed the professional guidance that the children could play together only with supervision because it appeared that Doe gave permission for someone who lost custody of his children due to neglect to supervise six children alone for a lengthy period of time. *See id.* at 1286, 1289–90 ("Even if there was an affirmative defense

17

. . . that defense does not negate the preliminary determination of probable cause" because "police officers aren't lawyers[, so] we do not expect them to resolve legal questions."); *Scarbrough*, 245 F.3d at 1303 n.8 ("Our inquiry in [a] qualified-immunity analysis is . . . not whether an arrestee's conduct is a crime or ultimately will result in conviction.").

Doe then argues that Deputy Smith misrepresented the adequacy of Jimmy's supervision of the children. Doe says that Deputy Smith told the magistrate judge that Doe should have known that Jimmy was an inadequate caregiver. Doe says that Deputy Smith should have instead told the magistrate judge that Jimmy had been on his best behavior for the preceding eight months, had no previous record, and was a trusted family member.

Even assuming that Deputy Smith intentionally or recklessly omitted those alleged facts to the magistrate judge, those facts would not vitiate arguable probable cause. A reasonable officer could still believe that allowing Doe's daughters to play and have a sleepover with their previous molester, R.L., was criminally negligent, especially when the only adult supervisor was someone who did not have custody of his own children because he neglected them and who had only recently reentered their lives.

Doe finally argues that it was recklessly false for Deputy Smith to secure two of the three arrest warrants because only one of her three daughters, R.D., said

18

that R.L. touched her during the relevant time period. Deputy Smith alleged in her warrant affidavits that Doe's action of leaving each daughter with R.L. caused each daughter harm. This argument fails too. Although second-degree child cruelty requires a showing of harm, Deputy Smith could have reasonably believed that all three girls suffered psychological harm by being left with their previous abuser for such a significant period. *See* Ga. Code Ann. § 16-5-70(c) (defining second degree child cruelty as occurring "when [a] person with criminal negligence causes a child under the age of 18 cruel or excessive physical *or mental* pain" (emphasis added)); *see also Grider*, 618 F.3d at 1257 (explaining that arguable probable cause does not "require proving every element of a crime"); *Scarbrough*, 245 F.3d at 1302–03. Indeed, Deputy Smith told Doe during their first interview that she was concerned about the psychological impact that R.L.'s molestation would have on Doe's daughters. So, even if Deputy Smith neglected to tell the magistrate judge that R.L. did not physically harm two of the girls, arguable probable cause would still have existed had she disclosed that fact. *Paez*, 915 F.3d at 1286 (explaining that "[p]robable cause is not a high bar" and does not even require a belief that a crime occurred by a "preponderance of the evidence") (internal quotation marks omitted)).

    2.  Deputy Smith Possessed At Least Arguable Probable Cause.

Doe argues that even if Deputy Smith did not make a misrepresentation or

19

omission sufficient to overcome qualified immunity, Deputy Smith lacked

arguable probable cause to arrest her. Again we disagree. Deputy Smith had

arguable probable cause.

When she secured the warrants, Deputy Smith knew that Doe was aware that

R.L. had a history of inappropriately touching each of Doe's daughters. The

forensic investigator told Doe after the second incident that she had to supervise

her daughters. Doe continued to allow her daughters to play with R.L., and R.L.

touched R.D. every time they played together despite that Doe said the family

followed the supervision rule. Doe admitted and the Division report stated that Doe

gave permission for her daughters to visit R.L. for at least part of the time she was

on the cruise. Doe's daughters spent several days and nights with R.L., and R.L.

inappropriately touched R.D. during the visit. Jimmy, who had recently moved in

with Donna and had lost custody of his children because he neglected them,

provided the only supervision during the visit. The Division intake report

expressed concern about Doe's failure to supervise her daughters. And the forensic

investigator familiar with the family history supported charging Doe for

negligence.

Based on these facts, arguable probable cause existed. All arguable probable

cause requires is that a reasonable officer possessing the same information "could

have believed that probable cause existed." *Grider*, 618 F.3d at 1257 (internal

20

quotation marks omitted). And a reasonable officer could have believed that Doe acted in "reckless disregard of consequences" that could reasonably be foreseen to occur by permitting her daughters to visit R.L. after learning that R.L inappropriately touched her daughters on at least two previous occasions. *Scott*, 834 S.E.2d at 92 (internal quotation marks omitted).

The argument for arguable probable cause becomes stronger when we consider R.L.'s statement that Doe allowed her daughters to sleep over. To be sure, Doe disagrees with the credibility of R.L.'s statement and says that she, her brother, and her father all told Deputy Smith that Doe did not allow the sleepover. Although we credit Doe's and her brother's statements that they told Deputy Smith that Doe did not give permission for a sleepover, Doe does not dispute that R.L. made a statement to the contrary.

We do not ordinarily second guess an officer's choice to credit one witness over others. *Paez*, 915 F.3d at 1286. And it was reasonable for Deputy Smith to believe R.L. over the adults. Unlike the adults, R.L. had no reason to lie. Doe and her family, in comparison, were worried they might lose custody of the children if they were found negligent. When the arrest warrants were secured, Deputy Smith possessed information suggesting that Doe granted permission for her daughters to sleep over because R.L. said that was the case, a Division report arguably supported that statement, and Doe admitted to at least providing permission to visit

21

during that time. Arguable probable cause existed.

### B.  *Deputy Smith Is Entitled to Official Immunity.*

Doe also brought a claim for malicious prosecution under Georgia law, Ga. Code Ann. § 51-7-40. Like qualified immunity, "[o]fficial immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice or corruption." *Bateast v. Dekalb Cty.*, 572 S.E.2d 756, 757 (Ga. Ct. App. 2002) (alteration adopted) (internal quotation marks omitted). But Georgia official immunity and federal qualified immunity do not rise and fall together because Georgia law requires us to inquire into the official's "subjective intent." *Jordan v. Mosley*, 487 F.3d 1350, 1357 (11th Cir. 2007).

To overcome official immunity, a plaintiff must establish "actual malice"; that is, the "deliberate intention to do wrong." *Selvy v. Morrison*, 665 S.E.2d 401, 404–05 (Ga. Ct. App. 2008). This standard is "demanding," *Black*, 811 F.3d at 1266, because it "requires more than harboring bad feelings or ill will about another; rather, ill will must also be combined with the intent to do something wrongful or illegal," *Wyno v. Lowndes Cty.*, 824 S.E.2d 297, 304 (Ga. 2019) (internal quotation marks omitted). And because "actual malice" does not include "implied malice, i.e., the reckless disregard for the rights or safety of others," *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007) (internal quotation marks

22

omitted), we cannot "speculate and make assumptions" about improper motive, *Conley v. Dawson*, 572 S.E.2d 34, 37 (Ga. Ct. App. 2002). "[A]n inference of malice is insufficient to overcome [the] immunity defense." *Watkins v. Latif*, 744 S.E.2d 860, 863 (Ga. Ct. App. 2013).

Doe argues that Deputy Smith lied to the Sheriff, the forensic investigator, the prosecutor, and the Division investigator about Jimmy's status as a previous offender, but only one witness, the Division investigator, definitively stated that she believed Deputy Smith told her Jimmy had a previous record. That single statement is insufficient to establish actual malice. *See Conley*, 572 S.E.2d at 36–38 (concluding that plaintiff failed to prove improper motive or actual malice based on evidence that an officer discounted a witness's statement and excluded the statement from the police report).

Doe also argues that Deputy "Smith buried the exculpatory witness statements of" Doe's father and brother, who stated that they told Deputy Smith that Doe did not provide permission for a sleepover. But that assertion is likewise insufficient to overcome official immunity. *See id.* "Burying" these statements does not establish that Deputy Smith deliberately intended to do wrong by arresting Doe. *See Selvy*, 665 S.E.2d at 404–05; *Conley*, 572 S.E.2d at 37–38.

Doe finally argues that Deputy Smith made "statements demonstrat[ing] that she was unreasonably angry towards Doe," which motivated her arrest of Doe. But

23

evidence of "frustration, irritation, and possibly even anger is not sufficient to penetrate official immunity." *Tittle v. Corso*, 569 S.E.2d 873, 876–878 (Ga. Ct. App. 2002) (internal quotation marks omitted) (concluding that an officer's acts of slamming a suspect against his vehicle, threatening the suspect, and using profanity in apprehending the suspect did not establish actual malice); *see also Selvy*, 665 S.E.2d at 406 (concluding that an officer's use of a derogatory term to refer to the suspect and derogatory references about the suspect's boyfriend did not establish actual malice). Neither "unreasonable conduct" nor "recklessly illegal conduct . . . support an inference of actual malice" because the plaintiff must prove that the motive for the conduct was the deliberate intent to take a wrongful action. *Black*, 811 F.3d at 1266. That Deputy Smith expressed anger and frustration because she believed Doe inadequately protected her children does not establish an illicit purpose or motive that can overcome official immunity. *See Marshall v. Browning*, 712 S.E.2d 71, 75 (Ga. Ct. App. 2011) ("If Browning was motivated by her personal history and her perception that Marshall was guilty, this does not show an intent to do wrong."); *Anderson v. Cobb*, 573 S.E.2d 417, 419 (Ga. Ct. App. 2002) ("Ill will alone is insufficient to establish actual malice . . . .").

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of Deputy Smith.

24